**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOSEPH ARENA,<br><br>*Plaintiff*,<br><br>v.<br><br>COINBASE GLOBAL, INC.; COINBASE INC.; PAYWARD, INC. (d/b/a KRAKEN); HOUDINISWAP LLC; CHN GROUP LLC (d/b/a CHANGENOW); EASYBIT (d/b/a EASYBIT.COM); FIXEDFLOAT (d/b/a FF.IO); MEK GLOBAL LIMITED (d/b/a KUCOIN); PHOENIXFIN PTE LTD (d/b/a KUCOIN); FLASHDOT LIMITED (d/b/a KUCOIN); PEKEN GLOBAL LIMITED (d/b/a KUCOIN); BYBIT TECHNOLOGY LIMITED; BINANCE HOLDINGS LIMITED; PACKDRAW LIMITED; and JOHN DOE,<br><br>*Defendants*. | **Case No.:** 1:26-cv-12914 |

**DEFENDANT BINANCE HOLDINGS LIMITED'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION AND STAY ALL PROCEEDINGS REGARDING BINANCE**

# TABLE OF CONTENTS

*Page*

INTRODUCTION ........ 1

BACKGROUND ........ 2

I. Arena's Relationship and Contract with Binance ........ 2

II. Arena's Allegations Against Defendants ........ 4

III. Procedural History ........ 4

ARGUMENT ........ 5

I. ARENA MUST ARBITRATE HIS DISPUTE WITH BINANCE ........ 6

A. Arena Agreed to Arbitrate All of His Disputes with Binance ........ 7

B. The Question of Arbitrability Has Been Delegated to the Arbitrator ........ 9

C. The Appropriate Remedy Is a Stay of All Proceedings Against Binance, Including Binance's Response to the Complaint ........ 11

II. THE ARBITRATION AGREEMENT ASIDE, THE COURT SHOULD STAY ALL PROCEEDINGS INVOLVING BINANCE UNTIL ARENA HAS ARBITRATED WITH KRAKEN AND COINBASE ........ 11

CONCLUSION ........ 13

Pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3–4, Defendant Binance Holdings Limited ("Binance") respectfully moves the Court for an order compelling Plaintiff Joseph Arena ("Arena") to arbitrate his claims against Binance and staying all claims and proceedings in the above-captioned action with respect to Binance pending the outcome of that arbitration.

## INTRODUCTION

Arena's claims against Binance do not belong in front of this Court. Arena agreed to arbitrate his disputes with Binance. Back in 2018, when he opened his Binance Account, Arena agreed to Binance's Terms of Use via a clickwrap contract. This contract provided that by continuing to use his Binance account, Arena agreed to any revisions of the Terms of Use that Binance posted to its website. On January 14, 2026, Arena logged into his Binance account, which still contained cryptocurrency. At this time, the published Terms of Use included a broad arbitration agreement covering all claims against Binance, such as those raised by Arena in this lawsuit. In any event, the Terms of Use contain a delegation clause requiring that the arbitrator (rather than this Court) decide the scope of the arbitration agreement. As a result, the Court should stay Arena's claims against Binance and compel Arena to arbitration.

Regardless of Arena's contract with Binance, the Court should stay the proceedings against Binance because the claims against Binance are inextricably intertwined with and derivative of Arena's primary claims against Kraken and Coinbase, which have already been stayed pending arbitration. The Kraken and Coinbase arbitrations will likely determine facts and narrow issues for this litigation. Staying the claims against Binance until the arbitrations are resolved will therefore avoid inconsistent outcomes and promote judicial economy.

For these reasons, the Court should stay all proceedings against Binance in this action.

## BACKGROUND

### I. Arena's Relationship and Contract with Binance

Binance is a foreign company associated with the offshore crypto-asset exchange known as Binance.com. ECF No. 1-1 ("Compl.") ¶ 18. Since at least 2017, a user who wishes to transact on Binance.com must first create an account. **Exhibit 1**. Before a user can create an account, he must affirmatively check a box to declare that he agrees to Binance's Terms of Use. *Id.* The account creation screen includes a link to the Terms of Use directly next to the checkbox, and those Terms of Use are always publicly available on Binance's website[1]:




*Id.*

Arena created his Binance account on May 25, 2018. **Exhibit 2**. On that date, Arena expressly agreed to Binance's Terms of Use by checking the box stating "I agree to Binance's

[1] Until approximately June 2019, the terms were available at www.binance.com/agreement; after this time, the terms have been available at www.binance.com/en/terms. Since at least 2018, the bottom of the Binance.com homepage has always linked directly to these Terms of Use.

Terms of Use." Exhibit 1. The Terms of Use at the time were dated May 24, 2018. **Exhibit 3**. These Terms of Use did not contain an arbitration provision, but they stated that Binance had "the right to modify or change the terms and conditions of the agreement at any time and at its sole discretion" by "updating the revised Terms of Use on its website." *Id*. Arena agreed that his "continued use of Binance's services acts as acceptance of the amended agreement and rules." *Id*. In other words, Binance agreed to provide notice of any revised Terms of Use by publishing them on its website, and Arena agreed that continued use of Binance's services after a revision constituted acceptance of that revision.

On June 14, 2019, Binance updated the Terms of Use on its website to include a broad arbitration agreement covering all disputes between the user and Binance and delegating questions of arbitrability to the arbitrator. **Exhibit 4**. On June 21, 2019, Arena logged into his Binance account and traded Bitcoin, thereby assenting to the updated Terms of Use, including the arbitration agreement and delegation provision. Exhibit 2.

Between 2019 and 2021 and again in 2026, Arena periodically logged into his Binance account, thereby agreeing to the subsequent revisions to the Terms of Use published on Binance's website. Exhibit 2. The last time Arena logged into his Binance account (to date) was January 14, 2026. On this date, the Terms of Use published on Binance's website were dated January 5, 2026. **Exhibit 5** ("2026 Terms of Use"). The 2026 Terms of Use constitute the current contract between Arena and Binance. Section 37.1 of the 2026 Terms of Use provides in relevant part:

> You and Binance agree that . . . any Claim shall be exclusively and finally resolved by mandatory final and binding individual (not class) arbitration administered by the International Chamber of Commerce (the "ICC") in accordance with the ICC Rules of Arbitration in force at the time of the filing of the Claim (the "ICC Rules"). The ICC Rules are deemed incorporated by reference into this Clause 37.1.

*Id.*

## II. Arena's Allegations Against Defendants

Arena alleges that he was defrauded out of roughly $500,000 in cryptocurrency. Compl. ¶¶ 1–2, 20. On November 3, 2025, an unknown "John Doe" fraudster convinced Arena that his cryptocurrency account on the Kraken exchange was compromised. *Id.* ¶¶ 2, 37–46. When Arena could not immediately reach Kraken customer service, he transferred $500,000 from his Kraken account to another wallet he owned and controlled outside the Kraken exchange. *Id.* ¶¶ 49, 78, 96. This wallet was not a Coinbase wallet, but Arena managed it through an interface provided by Coinbase. *Id.* ¶¶ 89–92. Shortly after Arena deposited the $500,000 in this wallet, the funds were transferred to a wallet controlled by the alleged fraudster. *Id.* ¶¶ 96–97. Because this transfer was executed on the decentralized blockchain—not through any infrastructure owned or controlled by Kraken, Coinbase, or Binance—the transfer was irreversible. *Id.* ¶¶ 61, 98, 188. Arena contends he did not authorize this transfer. Arena concedes that once this blockchain transfer was completed, he had no ability to recover his funds, thereby making the alleged conversion of these funds complete as of November 3, 2025. *Id.* ¶ 99.

Immediately after gaining control of Arena's funds, the alleged fraudster made numerous transfers of smaller amounts to different wallets on multiple different platforms. *Id.* ¶¶ 4, 112–117. One platform to which the alleged fraudster transferred funds was Easybit, which Arena contends (without any factual support) "operated using liquidity and infrastructure nested at Binance." *Id.* ¶ 137. Arena asserts a claim for aiding and abetting conversion against Binance alleging that Binance's products and services contributed to his losses. *Id.* ¶¶ 195–206, 217–218.

## III. Procedural History

Arena filed his lawsuit in Massachusetts state court on April 21, 2026. ECF Nos. 1-1 at 2, 1–2 at 2. He served Coinbase and Kraken on April 30, 2026. ECF No. 1-2 at 2–3. Both Coinbase

and Kraken appeared before the state court and moved for a stay of the proceedings against them on the grounds that Arena had binding arbitration agreements with each company. *Id.* at 2, 16–18, 25–26, 118–125. Arena joined these motions, and the state court granted Kraken's motion. *Id.* at 130–133. Coinbase's motion was still pending at the time the case was removed to this Court, and Coinbase refiled it with this Court. ECF No. 8.

Without even attempting traditional service on Binance, Arena moved the state court for authorization to serve Binance via email. ECF No. 1-2 at 72–99. The state court granted Arena's motion for alternative service on May 28, 2026. *Id.* at 127–129. Arena then served Binance via email on June 9, 2026. *Id.* at 134–138. Once aware of this suit, Binance notified Arena that he had agreed to the company's Terms of Use, which included an agreement to arbitrate all disputes. Binance requested on multiple occasions that Arena dismiss his claims against Binance in favor of arbitration. Arena declined.

On June 25, 2026, Binance timely removed the case to this Court based on diversity jurisdiction. ECF No. 1. Because Arena has refused to dismiss his claims in favor of arbitration, Binance now moves to enforce its arbitration agreement with Arena by respectfully requesting that the Court stay all claims and proceedings with respect to Binance until Arena has arbitrated his dispute with Binance.

## ARGUMENT

By affirmatively clicking that he agreed to Binance's Terms of Use, Arena entered into a valid binding clickwrap contract with Binance. By continuing to access his Binance account over time, Arena agreed to the revisions of these Terms of Use that Binance published on its website, culminating in the 2026 Terms of Use, which includes both a broad arbitration agreement and a clause delegating questions of arbitrability—including the scope of the arbitration agreement—to

the arbitrator. To enforce this arbitration agreement, the Court should stay the claims and proceedings against Binance pending the resolution of the required arbitration.

Regardless of Arena's contract with Binance, the Court should issue a discretionary stay of the proceedings against Binance pending the resolution of Arena's arbitrations with Coinbase and Kraken. Because Arena's claims against Binance are inextricably intertwined with and derivative of his claims against Coinbase and Kraken, allowing Arena to proceed against Binance would risk inconsistent outcomes, waste judicial resources, and unduly prejudice Binance.

## I. <u>ARENA MUST ARBITRATE HIS DISPUTE WITH BINANCE</u>

Arbitration agreements are "valid, irrevocable, and enforceable." Federal Arbitration Act ("FAA"), 9 U.S.C. § 2. The FAA "was designed to promote arbitration" and "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts." *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 6 (1st Cir. 2014) (internal quotation marks and citations omitted). As a result, when interpreting an arbitration agreement, the parties' intentions "are generously construed as to issues of arbitrability," such that "ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration." *Id.* at 7 (cleaned up); *accord. CellInfo, LLC v. Am. Tower Corp.*, 352 F. Supp. 3d 127, 133 (D. Mass. 2018) ("[W]here an arbitration provision's scope is unclear, arbitration is the favored means of dispute resolution.").

Because of the federal policy in favor of arbitration, the burden of proof is on the party resisting arbitration. *Grand Wireless, Inc.*, 748 F.3d at 7 ("This presumption in favor of arbitration applies unless the party opposing arbitration rebuts it."); *Foshey v. Home Depot USA, Inc.*, 2013 WL 12210107, at *2 (D. Mass. Aug. 26, 2013) ("A party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."). Moreover, an arbitration clause

is severable from the rest of a contract and the mutual promise to arbitrate constitutes effective consideration from both parties, so "a party seeking to avoid arbitration usually must show that the arbitration clause itself is invalid. A challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate." *Toth v. Everly Well, Inc.*, 118 F.4th 403, 409 (1st Cir. 2024) (cleaned up).

**A. Arena Agreed to Arbitrate All of His Disputes with Binance**

Binance's right to compel arbitration here is straightforward. To compel arbitration, Binance "must show [1] that a valid agreement to arbitrate exists, [2] that the movant is entitled to invoke the arbitration clause, [3] that the other party is bound by that clause, and [4] that the claim asserted comes within the clause's scope." *Hogan v. SPAR Grp., Inc.*, 914 F.3d 34, 38 (1st Cir. 2019) (citation omitted); *Pan v. Experian Info. Sols., Inc.*, 2025 WL 2607941, *4 (D. Mass. Sept. 9, 2025) (quoting same). Binance meets all four of these requirements.

The 2026 Terms of Use Are a Valid Contract. When creating his Binance account on May 25, 2018, Arena checked a box stating that he agreed to Binance's Terms of Use, which were hyperlinked next to the box. Exhibit 1. This is a classic "clickwrap" contract, which "requires a user to affirmatively accept its terms by clicking a checkbox but does not require the user to view or scroll through those terms." *Toth*, 118 F.4th at 411. Massachusetts courts regularly enforce clickwrap contracts. *Pan*, 2025 WL 2607941 at *5; *see also Toth*, 118 F.4th at 413 ("[C]lickwrap contracts are the clearest manifestations of assent because they require users to affirmatively signal their acceptance of the attached terms." (internal quotation marks omitted)); *Emmanuel v. Handy Techs., Inc.*, 992 F.3d 1, 8 (1st Cir. 2021). When Arena clicked the box assenting to Binance's Terms of Use, he accepted Binance's offer and entered into a binding contract with Binance.

Binance May Enforce the Terms of Use Against Arena. Binance and Arena are both parties to the 2026 Terms of Use, so there should be no dispute that Binance is entitled to enforce the terms of this contract against Arena.

Arena Is Bound by the Arbitration Agreement in the 2026 Terms of Use. The Terms of Use Arena accepted when he created his account contained a clause allowing Binance to revise the contract by updating the terms on its website, thereby providing notice of such revisions. Exhibit 3. Arena agreed that whenever he used Binance's products and services, he was agreeing to any revised terms found on Binance's website. *Id.* The First Circuit has held that such "unilateral modification" clauses do not invalidate contracts, including clickwrap contracts. *Toth*, 118 F.4th at 415; *Bekele v. Lyft, Inc.,* 918 F.3d 181, 190 (1st Cir. 2019) (upholding validity of clickwrap agreement with unilateral modification provision).[2] Thus, when Arena logged into his account on January 14, 2026, he assented to the 2026 Terms of Use, which were published on Binance's website at that time.[3] Exhibits 2. The 2026 Terms of Use contain a broad mandatory arbitration agreement to which Arena must adhere. Exhibit 5 § 37.

Arena's Claims Are Within the Scope of the Arbitration Agreement. The arbitration agreement between Binance and Arena requires Arena to resolve any claim he has against Binance "by mandatory final and binding individual (not class) arbitration." Exhibit 5 § 37.1. Arena's present claim for aiding and abetting conversion must therefore be resolved through arbitration,

---

[2] Where, as here, the arbitration agreement includes a delegation clause, the First Circuit has additionally held that the question of whether a unilateral modification clause invalidates the contract must be submitted to the arbitrator. *Emmanuel*, 992 F.3d 1 at 8; *see also, infra,* Section I.B (explaining impact of delegation clause in Binance's Terms of Use).

[3] While Arena continued to periodically log into his Binance account until January 14, 2026, the last trade he made from that account was on June 21, 2019. Exhibit 2. The Terms of Use published on Binance's website on June 21, 2019, already contained a broad mandatory arbitration agreement and provision delegating questions of arbitrability to the arbitrator. Exhibit 4.

not this litigation. Arena's lawsuit here falls squarely within the scope of the arbitration agreement. But even if the scope of the arbitration agreement were deemed ambiguous, "ambiguities as to the scope of the arbitration clause itself [must be] resolved in favor of arbitration." *Vaiano v. United Nat'l Corp.*, 733 F. Supp. 3d 32, 44 (D. Mass. 2024); *Grand Wireless, Inc.,* 748 F.3d at 7–8 ("[T]he presumption in favor of arbitration applies to the resolution of scope [of arbitration] questions . . . . This presumption is particularly appropriate where, as here, the arbitration clause is broadly worded." (citation omitted)); *In re Zelis Repricing Antitrust Litig.*, 2026 WL 604995, at *10 (D. Mass. Mar. 4, 2026) ("The Supreme Court [has] made clear that where an agreement to arbitrate some issues exists, and there is a dispute over the scope of the arbitration agreement, the law requires that those matters be presumed to be arbitrable 'unless it is clear that the arbitration clause has not included them.'").

Because Arena affirmatively entered into a contract with Binance that was subsequently and properly amended to include a broad mandatory arbitration agreement, Arena must arbitrate his claims against Binance.

### B. <u>The Question of Arbitrability Has Been Delegated to the Arbitrator</u>

The arbitration agreement in the 2026 Terms of Use states that arbitration will take place "in accordance with the [International Chamber of Commerce] Rule of Arbitration in force at the time of the filing of the Claim ('ICC Rules'). The ICC Rules are deemed incorporated by reference into this Clause 37.1." Exhibit 5 § 37.1. Like the AAA Rules, the ICC Rules provide that the arbitral tribunal shall have the power to rule on the scope of its own jurisdiction. ICC Rules Art. 6 §§ 3–5, https://iccwbo.org/dispute-resolution/dispute-resolution-services/arbitration/rules-procedure/2021-arbitration-rules/ ("…any decision as to the jurisdiction of the arbitral tribunal, except as to parties or claims with respect to which the Court decides that the arbitration cannot

proceed, shall then be taken by the arbitral tribunal itself."). The First Circuit has held that the incorporation of a jurisdictional rule like this into an arbitration agreement constitutes the delegation of arbitrability questions to the arbitrator. *See Toth*, 118 F.4th at 414 (holding that arbitration provision stating that disputes shall be resolved in accordance with AAA rules constitutes delegation of arbitrability to arbitrator); *Apollo Comput., Inc. v. Berg*, 886 F.2d 469, 472–73 (1st Cir. 1989) (holding incorporation of ICC rules delegated arbitrability to arbitrator). Thus, the 2026 Terms of Use delegate questions of arbitrability—including the scope of the arbitrability agreement—to the arbitrator.

Where, as in this case, an arbitration agreement delegates questions of arbitrability to the arbitrator, the Court must compel the parties to arbitrate those questions. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67–68, 71 (2019). "In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *McCabe v. Ford Motor Co.*, 774 F. Supp.3d 332, 345 (D. Mass. 2025) (quoting *Henry Schein, Inc.*, 586 U.S. at 68). Because the 2026 Terms of Use delegate the question of arbitrability to the arbitrator via its incorporation of the ICC Rules, any dispute Arena raises regarding the scope and applicability of the arbitration agreement to his claims in this case must be submitted to arbitration in the first instance. *Am. Graphics Inst., LLC v. Noble Desktop NYC, LLC*, 2023 WL 4826936, at *5 (D. Mass. July 27, 2023) ("[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." (quoting *Bossé v. New York Life Ins. Co.*, 992 F.3d 20, 28 (1st Cir. 2021)).

### C. <u>The Appropriate Remedy Is a Stay of All Proceedings Against Binance, Including Binance's Response to the Complaint</u>

"When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024); *Perruzzi v. Campbell Soup Co.*, 169 F.4th 82, 87–88 (1st Cir. 2026) (interpreting *Spizzirri* to require mandatory stay of litigation once requested).

This lawsuit involves an arbitrable dispute between Arena and Binance, and Binance requests a stay of the claims and proceedings against it. In particular, Binance respectfully requests a stay of its response to Arena's Complaint. Binance wishes to reserve all of its rights to move to dismiss the Complaint at a later date, if necessary, including for lack of jurisdiction. However, it would be a waste of time and resources for the parties to brief—and for this Court to consider—the issues of this Court's jurisdiction and the legal viability of the Complaint before the Court rules on the antecedent question of whether Arena must arbitrate his claims against Binance. An order from this Court compelling arbitration would moot the need for any further pleadings or a motion to dismiss. As such, Binance respectfully requests that the Court stay all further proceedings against Binance until it has resolved this motion to compel arbitration.

## II. <u>THE ARBITRATION AGREEMENT ASIDE, THE COURT SHOULD STAY ALL PROCEEDINGS INVOLVING BINANCE UNTIL ARENA HAS ARBITRATED WITH KRAKEN AND COINBASE</u>

Regardless of its ruling on Binance's arbitration agreement with Arena, the Court should stay Arena's claims against Binance until he has arbitrated his disputes with Coinbase and Kraken. The state court already stayed Arena's claims against Kraken's in favor of arbitration, and Arena agreed to a stay of his claims against Coinbase in favor of arbitration. ECF No. 8.

Where a lawsuit involves both arbitrable and nonarbitrable claims, the Court has inherent authority to stay the nonarbitrable claims until the arbitrable claims have been arbitrated.

*McCarthy v. Azure*, 22 F.3d 351, 361 n.15 (1st Cir. 1994); *Schwartz v. HelloFreshSE*, 2026 WL 161514, at *7 (D. Mass. Jan. 21, 2026); *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 20 n.23 (1983) ("In some cases, of course, it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration."). Whether to issue such a stay is generally considered to be within the sound discretion of the district court, *see e.g., D'Auria v. D'Auria*, 2019 WL 4480831, at *4 (Mass. Suffolk Cnty. Super. Aug. 26, 2019), although some courts have indicated such a stay is actually mandatory because the FAA requires "'a stay [of] the trial of the action,' [which] suggests that the entire case should be stayed." *Odunukwe v. Trans Union, LLC*, 2021 WL 4554089, at *4 (D. Mass. Oct. 5, 2021); *Cannavo v. Enter. Messaging Servs., Inc.*, 982 F. Supp. 54, 60 (D. Mass. 1997) ("Under the plain language of the FAA, therefore, it appears that the court *must* stay the pending litigation." (emphasis in original)).

A stay of nonarbitrable claims is especially warranted where, as here, those claims are "inextricably intertwined" with and causally connected to the arbitrable claims. *D'Auria*, 2019 WL 4480831 at *4 (holding stay of nonarbitrable claims "makes particular sense where the arbitrable and non-arbitrable claims are 'inextricably intertwined' or where resolution of the arbitration would substantially narrow the issues." (citation omitted)); *Nat'l Ass'n of Gov't Emps., Inc. v. Nat'l Emergency Med. Servs. Ass'n, Inc.*, 2013 WL 12328629, at *1 (D. Mass. July 25, 2013) (staying nonarbitrable claims that were causally connected to arbitrable claims). Binance's alleged liability here is entirely derivative of the alleged wrongdoing of Kraken and Coinbase: Arena alleges his funds were converted as a result of Kraken and Coinbase's negligence and that those converted funds were then dissipated using Binance's services. *See Spencer Furniture, Inc. v. Media Arts Grp., Inc.*, 349 F. Supp. 2d 49, 53–54 (D. Mass. 2003) (staying claims against nonarbitrating defendant whose liability stemmed from arbitrating defendant's alleged liability).

Here, the Kraken and Coinbase arbitrations will likely narrow or even eliminate issues relevant to the claims against Binance. *See NetNumina Sols., Inc. v. DietRehab.com, Inc.*, 2001 WL 455842, at *10 (D. Mass. Apr. 6, 2001) (staying nonarbitrable claims where arbitrator's decision on arbitrable claims may have "evidentiary or issue-narrowing effect" on nonarbitrable claims); *Cannavo*, 982 F. Supp. at 60 (same). The arbitrators will necessarily make key factual and legal findings that will impact Arena's claims against Binance, such as whether Arena's funds were converted in the first place and the extent to which Coinbase and Kraken are liable for any such conversion. Staying the claims against Binance until such predicate questions are resolved by the arbitrations will promote judicial economy and avoid the possibility of inconsistent outcomes. *See Bowlby v. Carter Mfg. Corp.*, 138 F. Supp. 2d 182, 188–89 (D. Mass. 2001) (staying nonarbitrable claims because it will promote judicial economy).

## CONCLUSION

For the reasons explained above, Binance respectfully requests that the Court enter an order compelling arbitration and staying all claims and proceedings against Binance in the present action.

Dated: July 2, 2026

*/s/ Benjamin M. Stoll*
Benjamin M. Stoll (*pro hac vice*)
bstoll@carltonfields.com
CARLTON FIELDS, P.A.
1625 Eye Street, NW, Suite 800
Washington, DC 20006
Telephone: 202-965-8160

Paul B. Lewis (BBO# 690793)
paul.lewis@haynesboone.com
HAYNES BOONE
One Financial Center Suite 1100
Boston, Massachusetts 02111
Telephone: 617-598-2400

*Attorneys for Binance Holdings Ltd.*

**CERTIFICATE OF SERVICE**

I, Paul B. Lewis, do herby certify I caused a true copy of the foregoing document to be served through the Court's Electronic Case Filing ("ECF") system upon all counsel of record in this action.

*/s/ Paul B. Lewis*
Paul B. Lewis