**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ---------------------------------------------------x<br>JOSEPH ARENA,<br><br>Plaintiff,<br><br>v.<br><br>COINBASE GLOBAL, INC.; COINBASE, INC.; PAYWARD, INC. d/b/a KRAKEN; CHN GROUP LLC d/b/a CHANGENOW; FIXED-FLOAT d/b/a FF.IO; PACKDRAW LIMITED; and JOHN DOE,<br><br>Defendants.<br>---------------------------------------------------x | Civil Action No.<br>1:26-cv-12914-JEK<br><br>**FIRST AMENDED COMPLAINT AND JURY DEMAND** |

## FIRST AMENDED COMPLAINT

Plaintiff Joseph Arena ("Plaintiff" or "Arena"), by and through undersigned counsel, brings this action to recover nearly $500,000 in cryptocurrency stolen by Defendant John Doe ("Doe"). The claims presently proceeding in this Court focus on Doe and on the downstream services that allegedly converted, transmitted, or monetized Arena's identifiable property—principally Defendant CHN Group LLC d/b/a ChangeNOW ("ChangeNOW"), Defendant FixedFloat d/b/a FF.IO ("FixedFloat"), and Defendant PackDraw Limited ("PackDraw"). This First Amended Complaint also preserves Arena's claims against Coinbase Global, Inc. and Coinbase, Inc. (collectively, "Coinbase") and Payward, Inc. d/b/a Kraken ("Kraken"), which remain defendants of record but as to which proceedings are stayed pending arbitration. The transaction-specific allegations concerning ChangeNOW and PackDraw remain the principal focus of the active litigation.

## INTRODUCTION

1. This action arises from the theft and subsequent laundering of approximately $500,000 in cryptocurrency belonging to Plaintiff Joseph Arena, a Massachusetts resident. Arena's assets were not simply stolen and transferred once. They were rapidly fragmented, converted across multiple blockchains, routed through privacy-oriented swap services, and ultimately monetized through an online cryptocurrency-gambling platform in a coordinated effort to conceal their origin, ownership, and destination.

2. The theft was carried out by an unknown fraudster, Defendant John Doe ("Doe"), who targeted Arena through a sophisticated social-engineering scheme involving impersonation, credential compromise, multi-factor-authentication alert fatigue, password-reset messages, and fraudulent communications purporting to come from legitimate cryptocurrency-exchange support personnel. Doe induced Arena to transfer his assets to a wallet that Doe had already positioned himself to control.

3. The theft was only the first stage of the scheme. Within hours of obtaining Arena's cryptocurrency, Doe began a rapid, multi-chain laundering campaign designed to place successive layers of transactions between the stolen assets and their lawful owner. The laundering involved peel-chain transfers, instant exchangers, nested swap services, cross-chain conversions, newly utilized addresses, and privacy-oriented transaction infrastructure—all directed toward making Arena's property increasingly difficult to trace, restrain, and recover.

4. Arena promptly retained zeroShadow, a blockchain-intelligence and digital-asset tracing firm, to investigate the theft. zeroShadow's investigation reconstructed the movement of Arena's stolen cryptocurrency transaction by transaction and identified the specific services, deposit addresses, withdrawal addresses, transaction hashes, assets, and blockchains used in the laundering sequence.

5. That investigation identified Defendant CHN Group LLC d/b/a ChangeNOW ("ChangeNOW") as an active transaction participant in the laundering path—not merely a passive destination to which Doe happened to send funds. The tracing identified six Bitcoin transactions, totaling approximately 1.885 BTC and approximately $198,916 at the time of transfer, expressly associated with HoudiniSwap transactions using ChangeNOW liquidity. Those six transactions occurred within approximately thirty-two minutes during the same continuous laundering sequence.

6. The investigation also identified the corresponding outbound transactions from those ChangeNOW-associated swap legs. Through those transactions, stolen Bitcoin was converted into or exchanged for multiple different assets across multiple blockchains, including Bitcoin, DAI on Ethereum, ATOM on Cosmos, and ASTER on BNB Smart Chain. At least two of those outputs were sent directly to an address identified in the tracing as a PackDraw deposit address.

7. zeroShadow separately identified additional downstream transactions as ChangeNOW transactions on the path from the converted assets toward PackDraw. The tracing thus documents both the inbound use of ChangeNOW liquidity and the outbound transaction activity through which Arena's stolen property was converted, moved across chains, and delivered directly or indirectly toward its eventual monetization.

8. ChangeNOW's relationship with HoudiniSwap is therefore central to the laundering scheme alleged here. HoudiniSwap marketed a privacy-oriented swap product that allowed users to exchange cryptocurrency through third-party liquidity providers. According to the tracing, ChangeNOW supplied liquidity and transaction execution used to complete repeated HoudiniSwap swaps involving Arena's stolen assets. On information and belief, this integration

enabled users to obtain ChangeNOW liquidity and execution through HoudiniSwap's privacy-oriented interface without establishing a direct, meaningfully identified customer relationship with ChangeNOW.

9. ChangeNOW therefore did more than passively receive cryptocurrency or maintain a website accessible to Doe. Its transaction infrastructure repeatedly accepted input assets, supplied liquidity, performed or enabled conversions, and delivered output assets to new addresses and blockchains. Those affirmative acts materially advanced Doe's ability to conceal, convert, and dissipate Arena's identifiable property.

10. The laundering paths ultimately converged at Defendant PackDraw Limited ("PackDraw"), the principal monetization point identified by the investigation. After obtaining withdrawal information from intermediary swap services, zeroShadow determined that at least approximately $315,571.54 of Arena-linked cryptocurrency was sent to the PackDraw gambling platform. The tracing appendix identifies thirteen PackDraw deposit transactions across Bitcoin, Ethereum, BNB Smart Chain, and Solana involving BTC, DAI, ETH, SOL, ASTER, and USDT.

11. Those transactions were not a single accidental or fortuitous deposit. Arena-linked assets repeatedly entered PackDraw through multiple addresses, multiple assets, and multiple blockchains over a period of days. On information and belief, PackDraw accepted those deposits into customer account(s), credited corresponding platform value, permitted the assets or their substitute value to be wagered, transferred, or withdrawn, and derived fees, wagering revenue, house advantage, spreads, or other financial benefits from their use.

12. The blockchain trace could identify the PackDraw deposit addresses, but it could not identify the natural person or persons controlling the recipient account(s). That information resides in PackDraw's internal records. zeroShadow therefore specifically recommended

obtaining from PackDraw the KYC information, transactional records, device and IP data, withdrawal information, and other personally identifiable information associated with the accounts that received Arena's stolen assets.

13. By at least January 2026, PackDraw had actual notice that specifically identified cryptocurrency received through its platform constituted property stolen from Arena, an identified Massachusetts victim, and that PackDraw's internal account and KYC records were necessary to identify the wrongdoer and trace the disposition of the assets. Yet PackDraw has not disclosed to Arena the identity of the recipient account holder(s), their KYC information, transaction and withdrawal history, IP or device information, or other records capable of identifying the persons who received, controlled, wagered, or withdrew Arena's property.

14. This is therefore not a case in which foreign platforms are sued merely because stolen cryptocurrency happened to pass through them. The active claims against ChangeNOW arise from repeated, transaction-specific liquidity and conversion activity that affirmatively altered and moved Arena's stolen property during the laundering sequence. The active claims against PackDraw arise from its repeated receipt, account-level processing, and monetization of traced proceeds and, independently, from its conduct after receiving actual notice of Arena's ownership claim. Arena also continues to pursue a narrower transaction-specific claim against FixedFloat based on two identified FixedFloat transactions in a downstream cross-chain path toward a suspected PackDraw destination.

15. Coinbase and Kraken remain defendants of record. The claims against them arise from conduct preceding the downstream laundering sequence—Coinbase's alleged design and security failures concerning the wallet environment into which Arena transferred his assets, and Kraken's alleged misrepresentations concerning the availability of 24/7 customer support during

the active security incident. Proceedings on those claims are stayed pending arbitration. They are repleaded here solely to preserve them in this superseding pleading, and Arena does not seek adjudication of those stayed claims while the stays remain in effect.

16. Defendants previously dismissed from this action are not repleaded. This First Amended Complaint accordingly preserves the complete set of claims against defendants who remain of record while placing the principal emphasis on the claims presently being litigated against ChangeNOW and PackDraw and on the specific tracing evidence supporting those claims.

## PARTIES

17. Plaintiff Joseph Arena ("Arena") is an individual residing in Massachusetts. At all relevant times, Arena was the lawful owner of the cryptocurrency at issue in this action and possessed the immediate right to control, possess, and use that property. Arena suffered the loss of possession, use, value, and recoverability of his cryptocurrency as a result of the conduct alleged herein.

18. Defendant Coinbase Global, Inc. is a publicly traded corporation that, according to the original Complaint, is incorporated in Texas and maintains a business address in New York. Coinbase Global, Inc. owns and operates businesses providing cryptocurrency products and services to consumers, including through its subsidiaries and affiliates.

19. Defendant Coinbase, Inc. is a wholly owned subsidiary of Coinbase Global, Inc., incorporated in Delaware and located in California. Coinbase, Inc. is responsible for the design, implementation, operation, and security of Coinbase products and services, including the Coinbase Wallet environment implicated in Arena's stayed negligence claim. Coinbase Global, Inc. and Coinbase, Inc. are referred to collectively as "Coinbase."

20. Defendant Payward, Inc., doing business as Kraken ("Kraken"), is a Delaware corporation with principal offices in California that owns and operates a cryptocurrency exchange and custody platform. Kraken maintained a direct account relationship with Arena and publicly represented that it provided continuous, 24-hour customer support, including for account-security issues and suspected unauthorized access. Proceedings on Arena's claim against Kraken are stayed pending arbitration.

21. Defendant CHN Group LLC, doing business as ChangeNOW ("ChangeNOW"), is a limited liability company organized under the laws of Saint Vincent and the Grenadines, with its principal place of business in Kingstown, Saint Vincent and the Grenadines. According to ChangeNOW's corporate disclosure statement filed in this action, ChangeNOW has no parent corporation and its sole member is a citizen of Brazil.

22. ChangeNOW owns and operates an interactive cryptocurrency instant-exchange and swap service through which users can exchange one digital asset for another, including across different blockchains. ChangeNOW does not merely publish information or provide passive software. Its service receives digital assets through designated transaction addresses, supplies or accesses liquidity, executes or facilitates conversions, and causes resulting assets to be transmitted to destination addresses designated as part of the transaction. As alleged below, ChangeNOW's liquidity and transaction infrastructure was repeatedly used to convert and move Arena's stolen cryptocurrency during the laundering sequence at issue in this action.

23. Defendant FixedFloat d/b/a FF.IO ("FixedFloat") is a foreign entity that owns and operates the cryptocurrency instant-exchange and cross-chain swap service accessible at ff.io. zeroShadow traced a portion of Arena-linked Bitcoin through two transactions it identified as FixedFloat transactions in a path moving from Bitcoin toward BNB Smart Chain and a suspected

PackDraw destination. The precise legal form, place of organization, ownership, and internal transaction records of FixedFloat are presently unknown to Arena and are matters within Fixed-Float's possession or control.

24. Defendant PackDraw Limited ("PackDraw") is a private limited company with its registered office and principal place of business in Nicosia, Cyprus. According to PackDraw's corporate disclosure statement filed in this action, PackDraw has no parent corporation and no publicly held corporation or organization owns ten percent or more of its stock.

25. On information and belief, PackDraw Limited owns, operates, controls, administers, and/or materially participates in the operation of the cryptocurrency gaming platform known as PackDraw, including the deposit infrastructure, customer accounts, account-crediting systems, wagering functionality, withdrawal functionality, and associated customer and compliance records through which the Arena-linked cryptocurrency identified below was received and processed. The blockchain tracing attributes multiple identified deposit addresses to PackDraw, and the platform maintained an operational contact through which information concerning those deposits could be sought.

26. PackDraw has denied in its motion papers that it operates the PackDraw platform as alleged. The ownership, operational control, contractual relationships, wallet infrastructure, customer-account administration, and custody of records associated with the platform are matters peculiarly within PackDraw's knowledge and possession. Arena therefore pleads PackDraw Limited's ownership, operation, control, and/or material participation on information and belief based upon the blockchain tracing attribution, the platform's identified operational contact information, PackDraw Limited's corporate identity, and its appearance in this action to defend claims arising from the PackDraw platform and the identified deposits.

27. Defendant John Doe ("Doe") is an individual or entity whose true identity is presently unknown to Arena. Doe fraudulently obtained unauthorized control over Arena's cryptocurrency and thereafter transferred, converted, concealed, and laundered that property through multiple blockchain addresses, instant-exchange services, cross-chain transactions, and cryptocurrency platforms, including the ChangeNOW-associated transactions and PackDraw deposits alleged below.

28. Arena has undertaken and continues to undertake reasonable efforts to identify Doe, including blockchain tracing and efforts to obtain KYC, transaction, device, IP, withdrawal, and other identifying information from platforms that received Arena's stolen assets. Arena will seek leave to substitute Doe's true name and identity when that information is ascertained.

**JURISDICTION AND VENUE**

29. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Arena asserts a claim arising under federal law against ChangeNOW and PackDraw under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1964(c).

30. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Arena's Massachusetts-law claims because those claims arise from the same theft, transfers, laundering transactions, recipient accounts, and course of conduct underlying the federal RICO claim and therefore form part of the same case or controversy under Article III.

31. Independently, the amount in controversy exceeds $75,000, exclusive of interest and costs. Arena is a citizen of Massachusetts. Based on the presently available information, none of the named Defendants is a citizen of Massachusetts: Coinbase Global, Inc. is incorporated in Texas and maintains its principal business operations outside Massachusetts; Coinbase, Inc. is incorporated in Delaware and located in California; Payward, Inc. is incorporated in

Delaware with principal offices in California; ChangeNOW is a foreign limited liability company whose sole member is a citizen of Brazil; PackDraw is organized and headquartered in Cyprus; and FixedFloat is alleged to be a foreign entity. The named Defendants are therefore diverse from Arena within the meaning of 28 U.S.C. § 1332(a). Doe's presently unknown citizenship does not affect the Court's independent federal-question jurisdiction or supplemental jurisdiction over claims arising from the same transaction sequence.

32. This action was originally commenced in the Massachusetts Superior Court for Suffolk County and was removed to this Court. Venue in this District is therefore proper under 28 U.S.C. § 1441(a), which fixes venue for a removed action in the federal district embracing the state court in which the action was pending. Suffolk County lies within the District of Massachusetts. See *Polizzi v. Cowles Magazines, Inc.*, 345 U.S. 663, 665–66 (1953).

33. Independently, the District of Massachusetts bears a substantial relationship to the controversy. Arena resided in Massachusetts when Doe directed the fraudulent communications to him; Arena received and acted upon those communications in Massachusetts; Arena exercised ownership and control over his cryptocurrency from Massachusetts; the fraudulent scheme induced Arena to take action concerning that property while he was in Massachusetts; and Arena suffered the loss of possession, use, value, and recoverability of his property in Massachusetts.

**A. Personal Jurisdiction Over Coinbase and Kraken**

34. Coinbase and Kraken maintained direct commercial relationships with Arena while he resided in Massachusetts and purposefully provided cryptocurrency products, account services, wallet functionality, and customer-support representations for Arena's use in Massachusetts.

35. Arena's stayed claims against Coinbase and Kraken arise directly from those forum contacts. The Coinbase claim concerns the security and wallet-import architecture of a

Coinbase product Arena used in Massachusetts in attempting to protect his assets, and the Kraken claim concerns representations regarding customer support made to Arena as a Kraken customer and his attempts from Massachusetts to obtain that promised support during the security incident.

36. Coinbase and Kraken have appeared in this action, and the claims against them are presently stayed pending arbitration. Arena repleads those claims to preserve them in this superseding pleading and does not seek to disturb the existing arbitration stays.

**B. Personal Jurisdiction Over John Doe**

37. This Court has specific personal jurisdiction over Doe under Federal Rule of Civil Procedure 4(k)(1)(A), G.L. c. 223A, § 3, and the Due Process Clause because Doe purposefully directed intentional fraudulent conduct at an identified Massachusetts resident and deliberately created contacts with Massachusetts in furtherance of that fraud.

38. Doe communicated directly with Arena while Arena was in Massachusetts, impersonated legitimate cryptocurrency-service personnel, made material misrepresentations intended to induce action by Arena in Massachusetts, and caused Arena to alter the disposition of property that Arena owned and controlled from Massachusetts.

39. Doe's Massachusetts contacts were neither random nor fortuitous. Doe intentionally selected and communicated with Arena, knew or reasonably understood where his victim was located through the communications and account-security scheme alleged herein, and purposefully induced conduct in Massachusetts for the specific purpose of obtaining Arena's cryptocurrency. Arena's fraud and conversion claims arise directly from those forum-directed acts.

**C. Massachusetts Specific Jurisdiction Over ChangeNOW**

40. This Court has specific personal jurisdiction over ChangeNOW under Federal Rule of Civil Procedure 4(k)(1)(A), G.L. c. 223A, § 3, and the Due Process Clause to the extent

established by the facts pleaded herein and the jurisdictional facts peculiarly within ChangeNOW's possession.

41. Arena does not predicate Massachusetts jurisdiction over ChangeNOW merely upon the existence of a globally accessible website, Arena's residence, or Doe's unilateral decision to route stolen property through a third-party service. Rather, Arena's claims concern ChangeNOW's own affirmative, revenue-generating transaction activity and the use of its liquidity and execution infrastructure to convert and move Arena's identifiable property.

42. As detailed below, the zeroShadow tracing identifies six inbound transactions expressly associated with HoudiniSwap's use of ChangeNOW liquidity, totaling approximately 1.885 BTC and approximately $198,916, all occurring within approximately thirty-two minutes during the same laundering sequence. It further identifies the corresponding outbound transaction legs, two additional downstream transactions expressly attributed to ChangeNOW, and another withdrawal leg labeled "Houdiniswap (ChangeNow)."

43. Those transactions required affirmative conduct by ChangeNOW. On information and belief, ChangeNOW's execution infrastructure recognized or controlled the relevant service deposit addresses, detected receipt of the input assets, supplied or obtained liquidity, performed or enabled the requested conversions, and caused output assets to be transmitted to designated addresses on the same or different blockchains. ChangeNOW thereby exercised transaction-specific control over the disposition and transformation of the property that passed through its infrastructure.

44. ChangeNOW's contacts relevant to this action therefore consist of its own commercial acts—accepting transaction inputs, supplying liquidity, converting assets, transmitting outputs, and earning transaction revenue—not merely the unilateral activity of Doe.

45. On information and belief, ChangeNOW knowingly and deliberately conducts cryptocurrency transaction business with customers located in the United States, including users located in Massachusetts; does not categorically exclude Massachusetts residents from using its transaction services; and derives fees, spreads, liquidity-provider compensation, or other revenue from transactions involving U.S. and Massachusetts users.

46. On information and belief, ChangeNOW also possesses transaction-level technical information capable of identifying the geographic source or characteristics of activity using its infrastructure, including IP information, geolocation information, transaction metadata, counterparty information, risk-scoring information, or information transmitted through its commercial and technical integration with HoudiniSwap.

47. To the extent ChangeNOW regularly conducts or solicits cryptocurrency-swap business in Massachusetts, engages in a persistent course of transaction activity with Massachusetts users, contracts to provide transaction services to Massachusetts users, or derives substantial revenue from services rendered to Massachusetts users, jurisdiction is authorized by G.L. c. 223A, § 3(a), (b), and/or (d).

48. Arena's claims relate to the same type of commercial transaction activity through which ChangeNOW purposefully serves remote users for compensation: the acceptance of cryptocurrency, supply of liquidity, execution of swaps, and transmission of converted outputs. The claims therefore do not depend upon an unrelated corporate contact or a wholly passive presence in Massachusetts.

49. The precise number of ChangeNOW users located in Massachusetts, the amount of Massachusetts-derived transaction volume and revenue, ChangeNOW's marketing or solicitation directed to Massachusetts and U.S. customers, its geo-blocking practices, its collection and

use of IP and geolocation information, and its U.S.-facing commercial relationships are facts uniquely or predominantly within ChangeNOW's possession.

**D. Massachusetts Specific Jurisdiction Over FixedFloat**

50. This Court has specific personal jurisdiction over FixedFloat under Federal Rule of Civil Procedure 4(k)(1)(A), G.L. c. 223A, § 3, and the Due Process Clause to the extent established by the facts pleaded herein and jurisdictional facts within FixedFloat's possession.

51. Arena does not predicate jurisdiction over FixedFloat merely on the accessibility of a global website or on Doe's unilateral conduct. The claim concerns FixedFloat's own alleged commercial acts in accepting Arena-linked cryptocurrency into identified swap transactions, executing or enabling cross-chain conversion, transmitting output assets, and earning transaction revenue.

52. As detailed below, zeroShadow traced approximately 0.116796 BTC from a ChangeNOW-associated withdrawal to Bitcoin address bc1q443yxv00mgs9d6yaaat7kdwq7e9883lg2z4fdx and then through two transactions it identified as FixedFloat transactions: e3a1253900664cefe6f82967249749dbbe9c3f5de3b3d532dbfcccb22773fda5 and d2447560c9a663338bdddb05aeb51d16c38e19e6ae82fa91bdfd492433db3218. zeroShadow traced that path toward BNB Smart Chain and an address it suspected was associated with PackDraw.

53. On information and belief, completing those swaps required FixedFloat to recognize or control transaction-specific deposit infrastructure, confirm receipt of input assets, execute or arrange the requested conversion, and cause corresponding output assets to be transmitted to designated destination addresses. Those are affirmative commercial acts by FixedFloat itself.

54. On information and belief, FixedFloat conducts cryptocurrency-swap business with users in the United States, including Massachusetts users; does not categorically exclude Massachusetts residents from using its transaction services; and derives fees, spreads, or other revenue from U.S. and Massachusetts transaction activity.

55. The precise extent of FixedFloat's Massachusetts contacts, including user counts, transaction volume, revenue, geo-blocking practices, IP and geolocation data, marketing, and the location of users associated with the transactions alleged here, is within FixedFloat's possession and is an appropriate subject of jurisdictional discovery if FixedFloat contests personal jurisdiction.

**E. Massachusetts Specific Jurisdiction Over PackDraw**

56. This Court independently has specific personal jurisdiction over PackDraw under Federal Rule of Civil Procedure 4(k)(1)(A), G.L. c. 223A, § 3, and the Due Process Clause to the extent established by the facts pleaded herein and the jurisdictional facts peculiarly within PackDraw's possession.

57. Arena does not rely merely upon the accessibility of PackDraw's website or upon the fortuity that a Massachusetts resident's property eventually reached a foreign recipient. The claims concern PackDraw's own alleged operation of an interactive cryptocurrency transaction and gaming platform through which PackDraw repeatedly accepted Arena-linked assets, attributed those deposits to customer account(s), credited corresponding platform value, permitted wagering, transfer, or withdrawal, and derived revenue from the use of the property.

58. The zeroShadow tracing identifies thirteen PackDraw deposit transactions involving Arena-linked assets across Bitcoin, Ethereum, BNB Smart Chain, and Solana and involving BTC, DAI, ETH, SOL, ASTER, and USDT. Those assets did not arrive through one isolated or

accidental transaction; multiple laundering branches converged repeatedly on PackDraw-attributed deposit addresses during the same course of conduct.

59. On information and belief, PackDraw generated, assigned, monitored, controlled, or otherwise used the identified deposit addresses to receive cryptocurrency for identifiable customer account(s), and PackDraw's internal systems associated those deposits with account information, KYC status, transaction and wagering histories, withdrawal destinations, device information, IP information, and compliance or risk information.

60. On information and belief, PackDraw knowingly conducts transaction and gaming business with users located in the United States, including Massachusetts; makes its interactive platform available for actual transactions with U.S. users rather than merely displaying information; accepts or has accepted cryptocurrency deposits from U.S. users; does not categorically exclude Massachusetts users; and derives revenue from U.S. and Massachusetts activity.

61. To the extent PackDraw regularly conducts or solicits business in Massachusetts, engages in a persistent course of conduct involving Massachusetts users, contracts to provide transaction or gaming services to Massachusetts users, or derives substantial revenue from services rendered in Massachusetts, jurisdiction is authorized under G.L. c. 223A, § 3(a), (b), and/or (d).

62. PackDraw's contacts with Massachusetts became still more direct no later than January 2026. By that time, Arena and/or his representatives had specifically notified PackDraw that the identified deposits constituted cryptocurrency stolen from Arena, identified Arena as the victim, informed PackDraw of Arena's Massachusetts location, identified the transactions and deposit addresses at issue, and sought PackDraw's assistance in identifying the recipient account(s) and preserving recovery options.

63. From that point forward, PackDraw knew both the identity of the person asserting ownership of the property and his location in Massachusetts. Any subsequent release, wagering, withdrawal, transfer, dissipation, destruction of identifying records, or other disposition of Arena-linked property or identifiable proceeds remaining within PackDraw's possession or control therefore was undertaken with actual knowledge that the conduct would affect the property rights of an identified Massachusetts victim.

64. PackDraw therefore could reasonably anticipate being called to account in Massachusetts for any post-notice conduct directed toward property it knew was claimed by a Massachusetts resident. The Massachusetts connection after notice arose from PackDraw's own knowing conduct, not merely from Arena's unilateral forum contacts or Doe's original routing decision.

65. Massachusetts has a substantial interest in providing a forum for an identified Massachusetts resident whose property rights were allegedly knowingly interfered with after a foreign platform received actual notice of his identity, location, and ownership claim. Arena likewise has a substantial interest in obtaining effective relief concerning the disposition and recovery of his property, and resolution in this Court promotes efficient adjudication of the interrelated transaction sequence alleged herein.

**F. Nationwide Personal Jurisdiction Under Federal Rule of Civil Procedure 4(k)(2)**

66. Independently of Massachusetts-specific jurisdiction, this Court has personal jurisdiction over ChangeNOW and PackDraw with respect to Arena's federal RICO claim under Federal Rule of Civil Procedure 4(k)(2).

67. Rule 4(k)(2) applies where a claim arises under federal law, the defendant is not subject to suit in the courts of general jurisdiction of any State with respect to that claim, and

exercising jurisdiction is consistent with the United States Constitution and laws. Arena's RICO claim arises under federal law and concerns Defendants' alleged participation in repeated financial transactions involving criminally derived property.

68. ChangeNOW is organized and headquartered in Saint Vincent and the Grenadines and has represented that it lacks sufficient contacts with Massachusetts to be subject to personal jurisdiction here. PackDraw is organized and headquartered in Cyprus and likewise has affirmatively contended that it is not subject to personal jurisdiction in Massachusetts.

69. Arena and undersigned counsel hereby certify that, based upon the information presently and readily available to them after reasonable investigation, they have not identified any State in whose courts of general jurisdiction ChangeNOW or PackDraw is subject to suit with respect to Arena's federal RICO claim. This certification is made for purposes of Rule 4(k)(2) and the First Circuit's burden-shifting framework.

70. If ChangeNOW or PackDraw contends that it is subject to suit with respect to the federal claim in the courts of a particular State, that information is uniquely available to the Defendant asserting it. Arena reserves all rights to rely upon that designation and, if appropriate, to seek transfer or other relief rather than dismissal.

71. On information and belief, ChangeNOW deliberately and repeatedly conducts transaction business with users throughout the United States and derives revenue from U.S.-based transaction activity. The RICO claim relates to those nationwide contacts because the conduct alleged here involves ChangeNOW's use of the same transaction, liquidity, and swap infrastructure to execute repeated conversions of cryptocurrency stolen from a United States victim.

72. On information and belief, PackDraw deliberately and repeatedly conducts cryptocurrency-account and gaming transactions with users throughout the United States and derives

revenue from U.S.-based activity. The RICO claim relates to those nationwide contacts because PackDraw allegedly used the same deposit, account-crediting, wagering, transfer, and withdrawal infrastructure through which it serves customers to receive and monetize Arena's stolen cryptocurrency.

73. The claims therefore concern the Defendants' commercial transaction activity within a market that they deliberately serve, not passive publication of information accessible from the United States. Each Defendant allegedly accepts digital assets, exercises transaction-level control over how those assets are converted, credited, transmitted, or made available for use, and receives economic compensation from completed transactions.

74. The exercise of jurisdiction under Rule 4(k)(2) is consistent with Fifth Amendment due process because ChangeNOW's and PackDraw's relevant contacts are assessed with respect to the United States as a whole. On information and belief, both Defendants deliberately conduct recurring commercial transactions with U.S. users and derive economic benefits from access to the U.S. market, making it foreseeable that they could be required to answer in a United States court for claims arising from that transaction activity.

75. The exercise of nationwide jurisdiction is also reasonable. The United States has a substantial interest in adjudicating federal claims concerning alleged laundering and monetization of property stolen from a U.S. victim through foreign platforms that deliberately transact with U.S. users; Arena has a substantial interest in obtaining effective relief in the United States; the relevant transactions were conducted electronically through globally accessible infrastructure; and ChangeNOW and PackDraw have already appeared through U.S. counsel to defend this action.

### G. Pendent Personal Jurisdiction Over the Related State-Law Claims

76. To the extent the Court exercises personal jurisdiction over ChangeNOW or PackDraw under Rule 4(k)(2) with respect to the federal RICO claim, the Court may also exercise pendent personal jurisdiction over the Massachusetts-law claims asserted against the same Defendant because all of those claims arise from a common nucleus of operative facts.

77. The federal and state claims concern the same stolen property, the same blockchain transactions, the same ChangeNOW-associated swap legs, the same PackDraw deposit addresses and recipient account(s), the same alleged knowledge and transaction processing, and the same resulting dissipation and loss of recoverability. Trying those claims together promotes judicial economy, avoids duplicative proceedings, and imposes no additional unfair jurisdictional burden upon either Defendant.

### H. Jurisdictional Discovery

78. Much of the evidence necessary to establish the full extent of ChangeNOW's, PackDraw's, and FixedFloat's Massachusetts contacts—and ChangeNOW's and PackDraw's nationwide contacts—is uniquely within their possession, including customer-location information, transaction volume, revenue by jurisdiction, IP and geolocation records, geo-blocking practices, U.S.-directed marketing and solicitation, servers and personnel, payment and banking relationships, and internal records identifying the geographic source of transaction activity.

79. The same is true of facts directly connecting those contacts to this action, including the commercial and technical relationship between ChangeNOW and HoudiniSwap; information transmitted between those platforms; ChangeNOW's control over the identified deposit and withdrawal legs; FixedFloat's control over the identified cross-chain transaction legs; PackDraw's ownership and operation of the receiving addresses; the location and identity of the

account holder(s) who received Arena's property; and the IP, device, KYC, withdrawal, and transaction records associated with those accounts.

80. Arena has pleaded a colorable and non-frivolous basis for jurisdiction supported by specific blockchain transactions, identified addresses, documented transaction pathways through ChangeNOW- and FixedFloat-associated infrastructure, repeated deposits to PackDraw-attributed addresses, and PackDraw's subsequent actual notice that the property belonged to an identified Massachusetts resident.

81. Accordingly, if ChangeNOW, PackDraw, or FixedFloat challenges personal jurisdiction, Arena respectfully requests that the Court permit targeted jurisdictional discovery concerning the matters identified above before resolving any request for dismissal under Rule 12(b)(2). Arena further reserves the right to submit declarations, documentary evidence, and other jurisdictional materials obtained through such discovery in opposition to any renewed jurisdictional challenge.

## FACTUAL BACKGROUND

### A. Doe's Theft of Arena's Cryptocurrency

82. On the night of November 3, 2025, continuing into the early hours of November 4, 2025 UTC, Defendant John Doe ("Doe") targeted Arena through a coordinated social-engineering and account-compromise scheme designed to create the appearance that Arena's cryptocurrency accounts and digital assets were under immediate threat.

83. The attack did not begin with a single telephone call. Beginning in or around October 2025, Arena received repeated multi-factor-authentication alerts. On the night of the theft, the activity escalated into repeated password-reset and security messages associated with Google, Coinbase, Kraken, and other services used by Arena.

84. The volume, timing, and apparent coordination of those communications created the appearance that unidentified persons were actively attempting to compromise Arena's accounts.

85. After the authentication and password-reset messages subsided, Doe and/or persons acting in concert with Doe contacted Arena by telephone while impersonating legitimate cryptocurrency-exchange support personnel.

86. Those callers falsely represented that Arena's cryptocurrency accounts were compromised or at immediate risk and induced Arena to take urgent action that he believed was necessary to protect his assets.

87. In response to what he reasonably understood to be an active account-security emergency, Arena moved cryptocurrency from accounts under his control into what he believed was a self-custodial wallet under his exclusive control.

88. Arena did not knowingly provide Doe with the destination wallet address, did not authorize Doe to access the destination wallet, and did not authorize Doe or anyone acting with Doe to take, transfer, exchange, convert, wager, conceal, or otherwise dispose of Arena's cryptocurrency.

89. Arena believed that the wallet displayed in his application was a wallet that he had previously created on January 11, 2025.

90. zeroShadow's subsequent forensic investigation determined, however, that a different wallet had been generated through a seed phrase on September 26, 2025 and imported into Arena's application on November 4, 2025 UTC.

91. zeroShadow reported that the mechanism by which that wallet was imported remained unclear. Arena had not engaged in screen sharing, and Arena verified that his mobile device did not contain malware.

92. Once Arena transferred his cryptocurrency, Doe obtained unauthorized control over it and almost immediately began moving the assets away from the initial receiving wallets.

93. zeroShadow identified two principal initial stolen-fund transactions.

94. At approximately 00:12 UTC on November 4, 2025, 2.8256166 BTC, worth approximately $301,081.06 at the time of transfer, was transmitted in Bitcoin transaction d315862a8593d0cd683fc11cffa7a721ef57a5d15232190e362939d54bf486f2 to threat-actor receiving address bc1qas4az09pxf2vf2u9vaxzf09fzp6em0r3jvn2gj.

95. Approximately three minutes earlier, at approximately 00:09 UTC, 198,587.726 USDC, worth approximately $198,581.84 at the time of transfer, was transmitted in transaction 0x20a466fbc454e2181c981417ac370b9b259cd0fda4c13a358d123fc102867bd0 to threat-actor receiving address 0xd02fA3c4B33ac928BB8c55dB899eC2056dcFcd6B.

96. Together, those two initial transactions represented approximately $499,663 in cryptocurrency at the contemporaneous values reported by zeroShadow.

97. Doe did not hold those assets in the initial receiving wallets. Within hours, Doe began dividing, converting, and routing the stolen property through multiple addresses, instant-exchange services, nested swap arrangements, bridges, blockchains, and downstream platforms.

98. The speed, fragmentation, and structure of those subsequent transactions are consistent with a deliberate effort to conceal the origin, ownership, and ultimate destination of Arena's property and to place successive transactional layers between the stolen assets and their lawful owner.

### B. Arena's Attempts to Obtain Kraken Customer Support

99. At the time Doe created the apparent account-security emergency, Arena maintained cryptocurrency in a Kraken account and understood Kraken to be one of the institutions responsible for safeguarding and servicing those assets.

100. Kraken publicly represented to customers, including Arena, that it provided "24/7 customer support," including support concerning account security and suspected unauthorized access.

101. Those representations were material to Arena because an exchange customer confronting suspected account compromise must be able to obtain timely information concerning whether the account is secure and what protective steps should be taken.

102. During and immediately after the fraudulent communications on November 3, 2025, Arena made multiple attempts to contact Kraken through its customer-support channels to determine whether the warnings he was receiving reflected an actual compromise of his account.

103. Arena's attempts occurred during an active and rapidly evolving security incident in which he reasonably believed substantial cryptocurrency was at immediate risk.

104. Kraken's customer-support interface was unresponsive or non-functional for Arena during the critical period. Arena was unable to reach live support or obtain timely confirmation, guidance, or assistance concerning the status of his account.

105. Arena received automated responses or no meaningful response and was unable to reach a Kraken representative who could confirm whether his account was secure or whether the warnings he had received were fraudulent.

106. Kraken did not provide Arena with timely information contradicting Doe's representations or advising him that the claimed compromise was not genuine.

107. Deprived of the assistance Kraken represented would be available, Arena made an urgent decision to move his cryptocurrency to what he believed was a separate self-custodial wallet under his exclusive control.

108. Arena alleges that had Kraken provided timely, accurate confirmation regarding the status of his account or the fraudulent nature of the communications, he would not have transferred his cryptocurrency into the compromised wallet environment and the subsequent theft would not have occurred in the manner alleged.

109. Arena's claim against Kraken based on these representations is stayed pending arbitration and is repleaded below solely to preserve the claim in this superseding Complaint.

**C. Arena's Transfer to Coinbase Wallet and the Coinbase Security Claim**

110. After Arena was unable to obtain timely assistance from Kraken, he attempted to protect his assets by moving them to a wallet environment that he believed was under his exclusive control.

111. Arena selected Coinbase Wallet because Coinbase marketed the product as a secure, user-controlled environment for storing and managing cryptocurrency and because Arena reasonably understood the wallet displayed in the application to be one he controlled.

112. Coinbase Wallet permits users to import or associate existing wallet credentials, including through seed-phrase functionality, so that previously created wallets can be managed through the Coinbase Wallet interface.

113. As alleged above, Arena believed that the wallet displayed in his application was a wallet he had created on January 11, 2025. zeroShadow later determined that a different wallet had been generated through a seed phrase on September 26, 2025 and imported into Arena's application on November 4, 2025 UTC.

114. zeroShadow reported that the mechanism by which the different wallet was imported remained unclear. Arena did not engage in screen sharing, and his mobile device did not contain malware identified by the investigation.

115. The absence of an identified malware or screen-sharing mechanism is material to Arena's stayed Coinbase claim because it supports investigation into the wallet-import, authentication, warning, and account-security architecture through which the different wallet became available in Arena's application.

116. Prior to the incident, Coinbase had notified Arena that certain personal information associated with him had been exposed in a data-security incident affecting Coinbase users. Arena alleges that this circumstance heightened the foreseeable risk that he would be targeted with sophisticated phishing or social-engineering attacks using account-specific information.

117. On information and belief, Coinbase knew that wallet users were foreseeable targets of phishing, credential compromise, seed-phrase theft, unauthorized wallet import, and social-engineering schemes designed to induce users to transfer digital assets into wallets already controlled by attackers.

118. On information and belief, the Coinbase Wallet environment permitted the imported or associated wallet involved here to appear and remain available for use without reasonable step-up authentication, meaningful user verification, or a sufficiently prominent warning confirming that the imported wallet credentials could already be known or controlled by another person.

119. Arena alleges that reasonable safeguards could have included meaningful confirmation before wallet import or association, enhanced authentication specifically tied to import

events, real-time notice of high-risk changes affecting wallet control, and warnings concerning the heightened risks associated with imported seed phrases or credentials.

120. Relying on the wallet interface and Coinbase's security representations, Arena transferred substantial cryptocurrency into the wallet environment he believed he exclusively controlled. Shortly thereafter, the cryptocurrency was removed without Arena's authorization and transmitted to the threat-actor addresses identified above.

121. Arena did not authorize, approve, or ratify the unauthorized removal of his cryptocurrency after it entered the wallet environment.

122. Arena alleges that Coinbase's negligent design and failure to employ reasonable safeguards concerning wallet import, authorization, and user warning materially contributed to Doe's ability to position a wallet under Doe's control as the destination for Arena's assets.

123. Arena's negligence claim against Coinbase is stayed pending arbitration and is repleaded below solely to preserve the claim in this superseding Complaint.

**D. zeroShadow's Investigation of the Laundering Sequence**

124. Arena retained zeroShadow on November 5, 2025—approximately one day after the theft—to investigate the attack and trace the movement of his cryptocurrency.

125. zeroShadow thereafter issued a Victim Intelligence Report dated December 18, 2025 (the "Report"), attached hereto as **Exhibit A,** documenting the attack vector and reconstructing the movement of Arena's stolen assets across Bitcoin, Ethereum, BNB Smart Chain, Cosmos, Solana, and other transaction infrastructure.

126. The zeroShadow investigation identified blockchain addresses controlled or used by the threat actor, intermediary deposit addresses, withdrawal transactions obtained from service providers, cross-chain conversions, downstream recipient addresses, and identifiable cryptocurrency services used during the laundering sequence.

127. zeroShadow concluded that Doe repeatedly used instant exchangers to move Arena's cryptocurrency from one asset or blockchain to another rather than simply transferring the original stolen assets directly to a single destination.

128. The services identified in the Report included HoudiniSwap transactions using liquidity associated with ChangeNOW and other providers, as well as Easybit, FixedFloat, ChangeHero, and other centralized-exchange or cross-chain infrastructure.

129. zeroShadow summarized approximately $221,000 of the stolen property as having been routed through HoudiniSwap, approximately $37,000 through Easybit, approximately $1,700 to Bitrefill, and approximately $62,000 to services that had not yet been identified at the time of the Report.

130. The Bitcoin laundering path was particularly structured. After the stolen Bitcoin arrived at bc1qas4az09pxf2vf2u9vaxzf09fzp6em0r3jvn2gj, Doe moved approximately 2.57 BTC—worth approximately $271,729 at the time—forward through what zeroShadow identified as a "peel-chain" pattern.

131. A peel chain is a transaction pattern in which a user repeatedly sends one portion of cryptocurrency to a counterparty or service while moving the remaining "change" to a new address under the user's control, and then repeats that process.

132. Through that structure, a single original balance can be divided into numerous separately routed transfers while the remaining balance continually moves to new addresses.

133. Doe employed that technique shortly after obtaining Arena's Bitcoin, sending successive portions into service deposit addresses while continuing to move the remaining Bitcoin through additional threat-actor-controlled addresses.

134. Certain recipient addresses appeared on-chain to be deposits at major centralized exchanges. zeroShadow determined, however, that several of those transactions were actually nested instant-exchange transactions in which an intermediary service used liquidity supplied by an underlying provider.

135. Among the underlying liquidity providers identified by zeroShadow was ChangeNOW.

136. This distinction is significant because the tracing did not identify ChangeNOW merely as an address that passively received stolen Bitcoin. It identified repeated transactions in which ChangeNOW-associated liquidity was used to receive an input asset and facilitate an exchange resulting in an output asset being transmitted elsewhere.

137. The laundering sequence thus combined several techniques in rapid succession: fragmentation through a Bitcoin peel chain; repeated use of instant exchangers; nested transaction services; changes in receiving addresses; conversion among different digital assets; movement across different blockchains; and eventual aggregation of substantial portions of the proceeds at an online cryptocurrency-gaming platform.

138. Each additional conversion and transfer made the movement of Arena's assets more difficult to follow using blockchain information alone and reduced Arena's practical ability to identify the persons controlling the property, restrain the assets before further disposition, and recover the specific cryptocurrency that had been taken from him.

**E. Repeated Inbound Transactions Using ChangeNOW Liquidity**

139. zeroShadow identified six Bitcoin transactions on November 4, 2025 that it expressly labeled "Houdiniswap (ChangeNow)."

140. According to zeroShadow's attribution, these transactions reflected HoudiniSwap transactions that used ChangeNOW liquidity to complete the requested swaps.

141. The first of the six occurred at approximately 05:23 UTC—only approximately five hours after Arena's Bitcoin had initially been stolen. In transaction 6f8db5e763621bd4ef38c59f45dacceb1d90f7110e79efd42f3d0c0b8d5f2f6e, Doe moved approximately 0.3 BTC, valued at approximately $31,657.72, from threat-actor address bc1qas4az09pxf2vf2u9vaxzf09fzp6em0r3jvn2gj into service deposit address 32HpaBePsGhi7NHStdXnkLiu77yBN7w368. zeroShadow attributed that transaction to "Houdiniswap (ChangeNow)."

142. Approximately twelve minutes later, at approximately 05:35 UTC, Doe executed another ChangeNOW-associated swap. Transaction e9a1964796d1dac7920ee4d54937d0d9ceea9768b07a93e32605824c6090f38a moved approximately 0.3 BTC, again worth approximately $31,657.72, from the same initial threat-actor Bitcoin address into service deposit address 3NEkAJhtruNkiC9sxLbh8BSrw2serHpEAj.

143. Also at approximately 05:35 UTC, transaction cd5129e727ba07dd61a083c4aa6459699096be1087fccfcdd02c6e4dc8ddec1b moved approximately 0.34 BTC, worth approximately $35,878.75, from threat-actor address bc1qyxcevndm5rh72h3u0mv52mxq7g3qc5xwxewjru into service deposit address 3Ln9zuzi5zq5ofSgyVgc2k8iG9drCVTCCK. zeroShadow again labeled the transaction "Houdiniswap (ChangeNow)."

144. At approximately 05:47 UTC, transaction e3099e4a69730400e7a710896160a16c43deeaecc2f260cf793b1df7bd5c2764 moved approximately 0.2 BTC, worth approximately $21,105.15, from threat-actor address bc1qknlvfvnuje4wkkqtszfwu0f6u8q9jjs5ew2hns into service deposit address 3AXZgqWkEq5vtJhdTvR8xSFMaAGLonUDfv.

145. At approximately the same time, transaction 731cbc091278daa82f36af81905bfb95c16bcd7aea9d0bd9532d4db5493f5f99 moved approximately 0.4 BTC, worth approximately $42,210.29, from threat-actor address bc1qdrgs5d6k8v730mt9ctfx6ypvwkavwuze9edg5x into service deposit address 3FPPSjzS31LkxQ3dQZavAe8sk5EZWpfb5m. zeroShadow likewise attributed that transaction to "Houdiniswap (ChangeNow)."

146. Finally, at approximately 05:55 UTC, transaction 2a930a6deff6a6290aeeb91e072bc5feb262b18b3fc524c7a958cfd1cbd18f47 moved approximately 0.345 BTC, worth approximately $36,406.37, from threat-actor address bc1qgs8yjs3s2ruxtvt4jkc5f20n36eyu8tda8ln38 into service deposit address 338y1Y9U9XwEZbcCqGBNptLdLBVUpraa5a.

147. Collectively, these six identified HoudiniSwap transactions using ChangeNOW liquidity received approximately 1.885 BTC of Arena's stolen Bitcoin, worth approximately $198,916 at zeroShadow's contemporaneous valuations.

148. All six transactions occurred within approximately thirty-two minutes.

149. They also occurred during the same continuing peel-chain movement of cryptocurrency originating from Arena's stolen Bitcoin and involved repeated transfers of similarly sized portions of the same stolen property.

150. The transactions therefore were not temporally isolated, unrelated uses of ChangeNOW-associated infrastructure by independent customers over an extended period.

151. Rather, the same ChangeNOW liquidity relationship was invoked repeatedly within minutes as Doe fragmented and converted Arena's recently stolen Bitcoin.

152. The repeated use of ChangeNOW-associated liquidity during this concentrated sequence is an important part of Arena's allegations concerning ChangeNOW's knowledge, role, and substantial assistance.

**F. The Outbound Transactions From the ChangeNOW-Associated Swap Legs**

153. zeroShadow did not stop its analysis at the inbound service deposit addresses.

154. zeroShadow contacted HoudiniSwap and obtained withdrawal information corresponding to the identified deposit addresses, permitting the investigation to determine how cryptocurrency emerged from the ChangeNOW-associated swap transactions after Arena's Bitcoin entered them.

155. The transaction associated with service deposit address 338y1Y9U9XwEZbcCqGBNptLdLBVUpraa5a produced Bitcoin withdrawal transaction e406749d2f3c98ef5f07f47de895b2a00399edd600ba063e32e1f9ae07113ef8, which sent approximately 0.34111542 BTC, worth approximately $35,658.99, to Bitcoin address bc1qn07gptflstszsu2egmcswg20ttwq7untanrhah.

156. A second ChangeNOW-associated input—received through service deposit address 3AXZgqWkEq5vtJhdTvR8xSFMaAGLonUDfv—was associated with the same Bitcoin withdrawal transaction, which sent an additional approximately 0.1964944 BTC, worth approximately $20,531.42, to that same downstream Bitcoin address.

157. The transaction associated with service deposit address 3FPPSjzS31LkxQ3dQZavAe8sk5EZWpfb5m did not result in another Bitcoin transfer. Instead, withdrawal transaction 0x66a9a440eae6d5d25fd9cac186ee4598ae9f6a2b0d1528dcb66b66812937c816 delivered approximately 41,339.75 DAI on Ethereum, valued at approximately $41,340, to address 0xA872B21bc75fe07c4B7d41eb557c1072cDB0f7aF.

158. zeroShadow's PackDraw Appendix independently identifies 0xA872B21bc75fe07c4B7d41eb557c1072cDB0f7aF as a PackDraw deposit address.

159. Thus, one of the expressly identified HoudiniSwap transactions using ChangeNOW liquidity took Arena-linked Bitcoin as an input and produced DAI on Ethereum that was transmitted directly to a PackDraw-attributed deposit address.

160. The transaction associated with service deposit address 3Ln9zuzi5zq5ofSgyVgc2k8iG9drCVTCCK likewise changed both the asset and the blockchain on which Arena-linked value was held.

161. Withdrawal transaction 9EA1F961BA7ACDE3DA3463748A2EDDE5F50E93C4D364FBBEE4E2E4539061C5F7 delivered approximately 14,235 ATOM, worth approximately $33,230.53, to Cosmos address cosmos1vu6jfvralv8khzs5dthaz2zcf0j5uqm2t4ulwy.

162. zeroShadow subsequently traced the funds from that Cosmos address through additional swaps toward PackDraw.

163. Critically, zeroShadow expressly identified two transactions in that downstream Cosmos-to-PackDraw route as ChangeNOW transactions: transaction A32AF475F27BB500AC91F8FA049ADCBB3682D5EAD5B27EE8F9DD0F2364A53D7B and transaction 33454E6CF573FF4EDE78D959457EB927BA57A41EEA35439AE3BCB4D6FD6728E9.

164. zeroShadow also identified two transactions on that same route as involving another swapper: 4aec9e50681311ef4581e7eab3752e9482b5ed902ff5c8595c3590490cbe4408 and 550e11c1cf755608b1972d8726b45e4e37cc8b1821619a7a44d569245e68d487.

165. Based on that transaction sequence, zeroShadow concluded that the funds originating from the Cosmos output were indirectly deposited to PackDraw on Ethereum after swaps using ChangeNOW and another swapper.

166. The transaction associated with service deposit address 3NEkAJhtruNkiC9sxLbh8BSrw2serHpEAj produced approximately 0.116796 BTC, worth approximately $17,825.43, through withdrawal transaction 1deba6542839ab751b5ab38241f8ed1e7917670c1e215602dbf4d8789bdd723e.

167. That Bitcoin was sent to bc1q443yxv00mgs9d6yaaat7kdwq7e9883lg2z4fdx.

168. zeroShadow subsequently traced that Bitcoin through additional transactions using FixedFloat toward a suspected PackDraw address on BNB Smart Chain.

169. The Report identifies the FixedFloat transactions on that route as e3a1253900664cefe6f82967249749dbbe9c3f5de3b3d532dbfcccb22773fda5 and d2447560c9a663338bdddb05aeb51d16c38e19e6ae82fa91bdfd492433db3218.

170. The transaction associated with service deposit address 32HpaBePsGhi7NHStdXnkLiu77yBN7w368 produced an entirely different asset on another blockchain.

171. Withdrawal transaction 0x05db8f9ec43df1a8d99826c8f738a9e9d4e96c0cbbedfea40050260afa031591 sent approximately 36,357.63 ASTER, worth approximately $30,616, on BNB Smart Chain directly to 0xA872B21bc75fe07c4B7d41eb557c1072cDB0f7aF.

172. As alleged above, zeroShadow's Appendix identifies that hexadecimal address as a PackDraw deposit address.

173. Accordingly, at least two outputs from the six identified HoudiniSwap transactions using ChangeNOW liquidity were delivered directly to the same PackDraw-attributed

address: approximately 41,339.75 DAI on Ethereum and approximately 36,357.63 ASTER on BNB Smart Chain.

174. Other ChangeNOW-associated outputs were routed through additional addresses or cross-chain transactions and then traced directly or indirectly toward PackDraw.

175. The inbound and outbound records therefore show considerably more than the passive receipt of already-stolen cryptocurrency by ChangeNOW. They document transaction legs through which recently stolen Bitcoin entered ChangeNOW-associated liquidity infrastructure and emerged in new assets, on new blockchains, at new addresses, including addresses attributed to PackDraw.

### G. A Separate Ethereum-Side Transaction Further Connecting ChangeNOW and PackDraw

176. zeroShadow identified an additional Ethereum-side transaction path involving HoudiniSwap and relevant to the relationship among HoudiniSwap, ChangeNOW, and PackDraw.

177. At approximately 00:39 UTC on November 4, 2025, approximately 5 ETH, worth approximately $18,061, moved from threat-actor address 0xd02fA3c4B33ac928BB8c55dB899eC2056dcFcd6B to service deposit address 0x43809dbFB89A018AbD19Ae165784Dd92c1E8f4f1.

178. In Table 5 of the zeroShadow Report, the inbound transaction to that deposit address is labeled “Houdiniswap (ChangeHero).”

179. In Table 6, however, zeroShadow identifies the corresponding withdrawal from that same deposit address as “Houdiniswap (ChangeNow).”

180. The corresponding withdrawal transaction, 0x0ff18d27d831f5ef26851968a6a4d4fff3c2779e9a76964e01c5e8f69e8caf05, transmitted

approximately 20,815.40 USDT on BNB Smart Chain to 0x3eCAC8206d56F2428221945CD8410819e67B1Fb0.

181. zeroShadow's PackDraw Appendix identifies 0x3eCAC8206d56F2428221945CD8410819e67B1Fb0 as a PackDraw deposit address.

182. Arena preserves zeroShadow's underlying attribution exactly as reported rather than attempting to resolve the discrepancy between the "ChangeHero" label applied to the inbound leg and the "ChangeNow" label applied to the corresponding outbound leg.

183. To the extent those differing labels reflect the involvement of multiple backend liquidity providers, a change in liquidity provider between transaction legs, or an attribution issue, the identity and role of the actual provider or providers are facts uniquely within the possession of HoudiniSwap, ChangeNOW, ChangeHero, and the relevant transaction counterparties and are appropriately resolved through discovery.

184. What is established by the Report is that the corresponding outbound transaction was expressly labeled by zeroShadow "Houdiniswap (ChangeNow)" and delivered more than $20,000 in Arena-linked value directly to a PackDraw-attributed address.

**H. ChangeNOW's Affirmative Transaction Role**

185. The transaction evidence distinguishes ChangeNOW from a financial institution or blockchain address that merely received an unsolicited transfer selected by Doe.

186. According to zeroShadow's tracing, ChangeNOW supplied liquidity used to complete repeated HoudiniSwap transactions involving Arena's stolen Bitcoin and was separately involved in additional identified downstream transactions.

187. In the six principal Bitcoin transactions alone, approximately 1.885 BTC of recently stolen property entered service deposit addresses associated by zeroShadow with HoudiniSwap transactions using ChangeNOW liquidity within a thirty-two-minute period.

188. Corresponding transaction outputs changed Arena-linked Bitcoin into Bitcoin at new addresses, DAI on Ethereum, ATOM on Cosmos, and ASTER on BNB Smart Chain.

189. At least two of those outputs were transmitted directly to a PackDraw-attributed address, while another ChangeNOW-associated output was subsequently routed through two additional transactions that zeroShadow expressly identified as ChangeNOW transactions on the path toward PackDraw.

190. ChangeNOW's alleged role therefore consisted of affirmative transaction activity: supplying liquidity, receiving or enabling receipt of transaction inputs, facilitating conversion of the input assets, and causing or enabling output cryptocurrency to be delivered to new addresses.

191. On information and belief, completion of those transactions required ChangeNOW's transaction infrastructure to recognize the applicable service deposit address, confirm receipt of the input cryptocurrency, provide or access the relevant liquidity, identify or receive instructions concerning the requested output, and transmit or cause transmission of the output asset to a destination address.

192. On information and belief, ChangeNOW earned fees, spreads, liquidity-provider compensation, or other economic benefits from transactions it executed or enabled.

193. Arena does not allege that ChangeNOW had actual knowledge merely because cryptocurrency transactions can be associated with fraud or because any single transaction displayed a generalized industry "red flag."

194. Rather, Arena alleges actual knowledge circumstantially from the specific and unusual transaction sequence involving his property.

195. That sequence included six ChangeNOW-liquidity inputs within approximately thirty-two minutes; their common derivation from a peel chain involving recently stolen Bitcoin;

similarly structured transaction amounts; repeated use of the same HoudiniSwap/ChangeNOW relationship; corresponding outputs into multiple different assets and blockchains; direct delivery of converted outputs to a PackDraw-attributed address; two additional downstream transactions expressly attributed to ChangeNOW; and another withdrawal leg labeled by zeroShadow as "Houdiniswap (ChangeNow)" that likewise terminated at a PackDraw-attributed address.

196. On information and belief, ChangeNOW's role in executing or supplying liquidity for those transactions also provided it with information that is not visible from the public block-chain alone, including transaction requests, counterparty information, deposit and destination information, risk assessments, wallet labels, compliance information, IP or device information, or other metadata transmitted through its integration with HoudiniSwap.

197. The precise information available to ChangeNOW when each transaction was executed—including any blockchain-intelligence alerts, wallet-risk labels, compliance alerts, risk scores, automated or manual reviews, transaction restrictions, counterparty communications, and internal escalations—is peculiarly within ChangeNOW's possession.

198. The repeated and concentrated use of ChangeNOW-associated infrastructure to convert portions of the same recently stolen property into multiple assets and deliver those assets toward the same downstream monetization platform supports Arena's allegation that ChangeNOW knew the transactions were part of a continuing concealment and laundering sequence rather than a series of unrelated ordinary retail swaps.

199. At minimum, the transaction-level facts provide a concrete basis for discovery into ChangeNOW's actual knowledge and treatment of each identified swap, rather than relying upon generalized allegations concerning cryptocurrency-industry practices.

200. By supplying the liquidity and execution infrastructure through which these particular assets were repeatedly converted and transmitted, ChangeNOW materially facilitated the continued movement and dissipation of the Arena-linked property processed through its infrastructure.

**I. FixedFloat's Cross-Chain Transaction Role**

201. zeroShadow identified a narrower but specific transaction path involving FixedFloat after one of the ChangeNOW-associated swap legs.

202. As alleged above, the transaction associated with service deposit address 3NEkAJhtruNkiC9sxLbh8BSrw2serHpEAj produced approximately 0.116796 BTC through withdrawal transaction 1deba6542839ab751b5ab38241f8ed1e7917670c1e215602dbf4d8789bdd723e and sent that Bitcoin to bc1q443yxv00mgs9d6yaaat7kdwq7e9883lg2z4fdx.

203. zeroShadow then traced the Arena-linked Bitcoin through two transactions it identified as FixedFloat transactions: e3a1253900664cefe6f82967249749dbbe9c3f5de3b3d532dbfcccb22773fda5 and d2447560c9a663338bdddb05aeb51d16c38e19e6ae82fa91bdfd492433db3218.

204. According to the tracing, those FixedFloat transactions formed part of a cross-chain path from Bitcoin toward BNB Smart Chain and an address zeroShadow suspected was associated with PackDraw.

205. FixedFloat's alleged role was therefore transactional rather than passive. On information and belief, FixedFloat accepted Arena-linked cryptocurrency into transaction-specific deposit infrastructure, executed or enabled the requested conversion, and caused corresponding output assets to be transmitted to a new destination on another blockchain.

206. Arena alleges FixedFloat's actual knowledge circumstantially from the transaction-specific facts available to it, including the rapid post-theft movement of the same traced property, the use of two related FixedFloat transaction legs within a continuing cross-chain laundering path, and the transaction metadata and wallet-risk information available to FixedFloat as the service executing the conversion.

207. On information and belief, FixedFloat maintained or had access to blockchain-intelligence, transaction-monitoring, wallet-screening, or risk-management systems capable of identifying high-risk transaction characteristics, wallet labels, and other information bearing on the source and purpose of the relevant transactions.

208. The precise information available to FixedFloat—including any alerts, wallet labels, transaction reviews, risk scores, counterparty information, or compliance records—is peculiarly within FixedFloat's possession and will be established through discovery.

209. On information and belief, FixedFloat earned fees, spreads, or other transaction revenue from the swaps it executed or enabled.

210. Arena does not allege that every portion of his stolen cryptocurrency passed through FixedFloat. His claim is limited to the specific Arena-linked property and transaction path that zeroShadow identified as passing through FixedFloat.

**J. The Laundering Paths Repeatedly Converged at PackDraw**

211. The downstream tracing revealed a different but equally significant role for PackDraw.

212. zeroShadow contacted HoudiniSwap and Easybit and obtained withdrawal information that enabled it to trace substantial portions of Arena's stolen property beyond the instant-exchange layer.

213. Based on the withdrawal data and blockchain tracing, zeroShadow reported that approximately $315,571.54 of Arena-linked funds was sent to the cryptocurrency-gambling platform PackDraw.

214. zeroShadow further reported that the destinations of two other withdrawals remained unknown but were suspected to have also gone to PackDraw. Arena does not presently treat those suspected destinations as established PackDraw transactions.

215. The identified PackDraw transactions were not limited to a single blockchain, asset, date, or deposit address.

216. zeroShadow identified two Bitcoin deposits into PackDraw-attributed Bitcoin address bc1qlpm4ancleesfvsg5hnhjd7rhtrdy9peraamf2y.

217. The first occurred on November 4, 2025 at approximately 09:11 UTC, when transaction 9b65767d9a1c721ec577ba63497e5d05a24158a243497a548b06264dbce69e30 deposited approximately 0.22626613 BTC, worth approximately $23,520.75, into that PackDraw-attributed address.

218. A second deposit reached the same PackDraw-attributed Bitcoin address on November 5, 2025 at approximately 02:21 UTC. Transaction 4cb18da4bb1af0d5bb79bc4ce986ae57a99e8119a4f30f177bc816d1de4482a6 deposited approximately 0.29614128 BTC, worth approximately $29,993.71.

219. zeroShadow also identified repeated deposits into PackDraw-attributed hexadecimal address 0xA872B21bc75fe07c4B7d41eb557c1072cDB0f7aF.

220. On November 4, 2025 at approximately 05:18 UTC, transaction 0x57ebeb8e914f92f7b92d67ee3fbf973fe38f32e2b2dc4e31f9d2ea8cfdaaec4d deposited approximately 10.22 ETH, worth approximately $36,384.10, into that address.

221. Approximately eighty-one minutes later, at approximately 06:39 UTC, transaction 0x66a9a440eae6d5d25fd9cac186ee4598ae9f6a2b0d1528dcb66b66812937c816 deposited approximately 41,339.75 DAI, worth approximately $41,339.75, into the same PackDraw-attributed address.

222. As alleged above, that DAI transaction was the direct output of one of the Bitcoin inputs that zeroShadow expressly attributed to a HoudiniSwap transaction using ChangeNOW liquidity.

223. On November 5, 2025 at approximately 19:20 UTC, the same PackDraw-attributed hexadecimal address received approximately 36,357.63 ASTER on BNB Smart Chain through transaction 0x05db8f9ec43df1a8d99826c8f738a9e9d4e96c0cbbed-fea40050260afa031591, worth approximately $30,616.

224. That ASTER transaction likewise corresponded to one of the Bitcoin inputs zeroShadow expressly attributed to a HoudiniSwap transaction using ChangeNOW liquidity.

225. zeroShadow also identified a PackDraw-attributed Solana address, 893wj9Dy52mZG8oRQMTaQ28m2beTxEujAWv9J3YV9Pty.

226. On November 4, 2025 at approximately 08:13 UTC, approximately 38.17 SOL, worth approximately $6,038.68, was deposited to that PackDraw-attributed address through transaction 2af5mf6z7BHt9YJxpzQCtTFZA5c8HFptHtguNMRAaC-NDQs5F4BYwr4EJ3cvwQh8bNJJaoC6VfUrN3G72RDxe9wiv.

227. The tracing further identified four separate Ethereum deposits on November 12, 2025 into another PackDraw-attributed address, 0xB2a7C74889725f56E8B340c82b0a165F2e954faB.

228. At approximately 04:03 UTC, transaction 0xc5ed6f6dd15b133bda4835ba1a1758fee9ae6e372fc6dca3cb07f5ecf2f1467d deposited approximately 8.53296 ETH, worth approximately $29,366.71, into that address.

229. At approximately 04:10 UTC, transaction 0xa650afe33746f0cc173b33b7715e887dc74a4aa076deb6fbb568a12544a472fa deposited approximately 8.594671 ETH, worth approximately $29,579.09, into the same address.

230. At approximately 04:44 UTC, transaction 0x163d9ce8fae9f103358c2725b131457ba11bbd49ebcdc591a97e30e83fad0908 deposited approximately 1.44 ETH, worth approximately $4,968.31.

231. At approximately 04:52 UTC, transaction 0x542e43fcc07e75caea1f128ebc78723e9923d1882149f67e43579d343790696e deposited another approximately 14.15 ETH, worth approximately $48,684.91, into that same PackDraw-attributed address.

232. Thus, four separate Arena-linked Ethereum deposits totaling more than 32 ETH reached the same PackDraw-attributed address within approximately forty-nine minutes on November 12, 2025.

233. The Report also identifies three USDT deposits into PackDraw-attributed BNB Smart Chain address 0x3eCAC8206d56F2428221945CD8410819e67B1Fb0.

234. Transaction 0x0ff18d27d831f5ef26851968a6a4d4fff3c2779e9a76964e01c5e8f69e8caf05 deposited approximately 20,815.45 USDT into that address. As alleged above, zeroShadow identified the corresponding HoudiniSwap withdrawal leg as "Houdiniswap (ChangeNow)."

235. Transaction 0xf1947d3475b938124b6464bbdd853ed529b9a106c0abb6c56f1853705fc379be deposited approximately 21,307.74 USDT, worth approximately the same amount, into that PackDraw-attributed address.

236. Transaction 0x8715b3edb0e195d2dbf7938366baad7b42c921b4992dc40422a0137ceab3737f deposited an additional approximately 14,205.02 USDT into that same address.

237. The PackDraw deposits therefore involved multiple different digital assets—including BTC, ETH, DAI, USDT, ASTER, and SOL—arriving over multiple blockchains through multiple laundering branches.

238. They repeatedly converged at the same PackDraw-attributed addresses.

239. The repeated deposits are significant because they are inconsistent with PackDraw being merely the fortuitous recipient of one unsolicited cryptocurrency transfer.

240. Rather, substantial portions of the transaction paths reconstructed by zeroShadow repeatedly terminated within deposit infrastructure attributed to the same gaming platform.

241. zeroShadow's Report states that $315,571.54 was sent to PackDraw. Its Appendix separately lists the individual PackDraw transactions and their contemporaneous values.

242. Because the Report does not expressly reconcile its headline $315,571.54 figure with every transaction appearing in the Appendix, Arena does not artificially reconcile those figures or allege a greater amount than the Report establishes.

243. Arena therefore alleges that at least approximately $315,571.54 of his stolen cryptocurrency and traceable proceeds was sent to PackDraw, with the precise amount and ultimate disposition to be determined through discovery.

### K. PackDraw's Account Infrastructure Was the Point at Which Public Blockchain Tracing Reached Its Limit

244. The significance of PackDraw was not merely that identified blockchain addresses received Arena-linked cryptocurrency.

245. PackDraw operated a customer-facing gaming platform.

246. On information and belief, the PackDraw-attributed deposit addresses were generated, assigned, monitored, or otherwise used by PackDraw for the purpose of receiving cryptocurrency attributable to particular customer account(s).

247. On information and belief, when cryptocurrency arrived at those addresses, PackDraw's internal systems associated the deposit with a customer account and credited that account with corresponding cryptocurrency or platform value.

248. That account value could then, on information and belief, be wagered, transferred, converted, or withdrawn through PackDraw's platform.

249. This account-level processing created an information barrier that the public blockchain alone could not overcome.

250. The blockchain could reveal the deposit address and the incoming transaction. It could not reveal the natural person to whom PackDraw credited the deposit, the identity of the account holder, whether PackDraw had verified that person through KYC procedures, where the person was located, what device or IP address the person used, what wagering activity followed, or where the person ultimately withdrew the resulting account balance.

251. Those facts were uniquely available from PackDraw's internal records.

252. PackDraw therefore occupied a critical position in the recovery effort: blockchain tracing could establish that Arena-linked assets had reached PackDraw, but identification of the

natural person who obtained the corresponding platform credit required PackDraw's internal account information.

253. zeroShadow expressly recognized this limitation.

254. The Report recommended that Arena work with law enforcement or legal counsel to obtain a production order directed to PackDraw for KYC information, transactional information, device and IP data, and other personally identifiable information.

255. zeroShadow explained that those records could provide information concerning the status of Arena's stolen property and the identity of the threat actor or actors.

256. The Report further identified fred@packdraw.com as a PackDraw contact for that inquiry and stated that zeroShadow could provide additional tracing data and its Reactor graph if necessary.

**L. PackDraw Received Actual Notice of Arena's Ownership Claim**

257. By at least January 2026, Arena and/or his representatives contacted PackDraw concerning cryptocurrency traced to PackDraw-attributed deposit addresses.

258. PackDraw was informed that the identified cryptocurrency constituted proceeds of property stolen from Arena.

259. The notice identified Arena as the victim and informed PackDraw that the relevant property had been traced through intermediary transaction services into PackDraw deposit infrastructure.

260. PackDraw was thereby placed on notice not merely that some anonymous user might have engaged in suspicious activity, but that an identified individual claimed ownership of specific traced property that had entered PackDraw.

261. PackDraw was also informed of Arena's Massachusetts connection.

262. Arena and/or his representatives sought information necessary to identify the recipient account or accounts, determine the subsequent disposition of the property, identify withdrawal destinations, preserve records, and determine whether any Arena-linked assets or proceeds remained recoverable.

263. By that point, PackDraw possessed information unavailable to Arena or zeroShadow from public blockchain tracing alone.

264. On information and belief, PackDraw's records identified which customer account or accounts had been credited for the Arena-linked deposits.

265. Depending upon PackDraw's collection and compliance practices, those records also included or should have included the KYC status of the recipient account holder, transaction and wagering history, withdrawal destinations, IP information, device information, login history, risk information, and other personally identifying data.

266. PackDraw has represented that it maintains customer-identification or KYC information in connection with its compliance procedures.

267. Nevertheless, despite actual notice of Arena's ownership claim and the identified deposit transactions, PackDraw has not disclosed to Arena the identity of the recipient account holder or holders.

268. PackDraw likewise has not disclosed the complete KYC information, account history, wagering history, withdrawal history, IP information, device information, or other records associated with the persons who received and used Arena-linked cryptocurrency.

269. If PackDraw collected KYC or equivalent identifying information for the recipient accounts, those records may identify Doe or other persons who controlled, wagered, withdrew, transferred, or benefited from Arena's stolen property.

270. PackDraw's continued withholding of that information has materially impaired Arena's ability to identify those persons and pursue the assets after their entry into PackDraw.

271. If, alternatively, PackDraw did not collect or preserve KYC or equivalent identifying information for accounts receiving the repeated high-value, multi-chain deposits identified above, the scope and circumstances of that failure are matters relevant to PackDraw's knowledge, good faith, account practices, and role in permitting cryptocurrency to be monetized without meaningful identification.

272. The identity of the recipient account holders, their KYC status, the location from which the accounts were accessed, their wagering and transaction history, and the disposition of the Arena-linked deposits are all matters peculiarly within PackDraw's control.

### M. PackDraw's Post-Notice Control and Disposition of the Property Are Subjects of Discovery

273. Arena presently lacks access to PackDraw's internal ledger and therefore cannot know from the public blockchain alone precisely when the recipient accounts wagered, transferred, converted, or withdrew the value associated with each deposit.

274. That chronology is particularly important because PackDraw had actual notice of Arena's ownership claim by at least January 2026.

275. To the extent any Arena-linked cryptocurrency, substitute cryptocurrency, platform credits, wagering balances, or identifiable proceeds remained in PackDraw's possession or control when PackDraw received that notice, PackDraw thereafter knew that an identified Massachusetts victim asserted ownership of the property.

276. To the extent PackDraw thereafter permitted that property or its substitute value to be wagered, transferred, converted, released, or withdrawn, such conduct occurred after PackDraw had been informed of Arena's ownership claim.

277. Discovery of PackDraw's internal account ledger will establish whether Arena-linked property or substitute platform value remained in any recipient account at the time PackDraw received notice.

278. Discovery will likewise establish whether PackDraw placed any restriction or freeze on the recipient accounts after notice, whether wagering continued, whether withdrawals were permitted, when those withdrawals occurred, and to what addresses or accounts the value was transmitted.

279. Those records will also establish what identifying information PackDraw possessed when Arena sought assistance and what records PackDraw preserved following notice of the dispute.

280. Arena therefore pleads the post-notice disposition allegations on information and belief because the operative facts cannot be determined from public blockchain records and reside exclusively within PackDraw's internal account systems.

**N. Other Traceable Property and the Continuing Nature of Arena's Loss**

281. zeroShadow's investigation did not conclude that all of Arena's stolen cryptocurrency reached PackDraw.

282. The Report separately identified two significant unspent balances that zeroShadow continued to monitor.

283. One address, 34bL4jxvWF4FyDwNWXrzwXt9DXPFVA5QET, held approximately 1.1076 BTC attributable in the Report to Arena, valued at approximately $102,899 at the time.

284. A second address, 0x192e239087159bD234c4481129386aB9434CD212, held approximately 10 ETH attributed to Arena, valued at approximately $35,608.

285. zeroShadow noted that the latter address had previously received other funds suspected to have originated from other victims.

286. In tracing Arena's property through that address, zeroShadow applied a Last-In-First-Out tracing methodology to attribute the remaining 10 ETH to Arena.

287. The USDC-side path also involved additional obfuscation through several intermediate addresses and the Near Bridge protocol.

288. zeroShadow traced approximately 120,000 USDC through addresses 0x0E1E3421d609d79F1aE7452E2fFaA71332665E5e, 0x03E9b83Cf9D6A9F5Ec0e5B601556E5Fcf67a235B, 0x0EE486e26Dc1e14ADF5408Fa85EE82318761C446, and 0x693C8a82f843574047CD2F7E406CE702Ef26F910 before the value was moved through Near Bridge.

289. zeroShadow identified Near Bridge transaction 243cf638a35d94448b8efa888048ebfc26b14242dd2be5706639502f2d65febb at approximately 01:10 UTC on November 4, 2025, reflecting a cross-chain conversion associated with approximately 1.12637984 BTC and 33.19643 ETH.

290. The resulting Bitcoin was sent to bc1qkyma9js225y675q066g8mf876l2tfvryz8kdn2 and thereafter approximately 1.126 BTC was moved to 32h3wsrJiRrb2Bbojnc6Qpsv84RvpyyGuM.

291. That balance remained substantially unspent until November 29, 2025, when a smaller portion—approximately 0.0187 BTC—was converted into SOL using Chainflip.

292. Approximately 12.30 SOL from that path was then deposited at Bitrefill through deposit address BsQxXLgY1N74XY9TEw7ujvkYKeELhu1eNzBpYTS3n8su.

293. The remaining approximately 1.108 BTC continued to reside at 34bL4jxvWF4FyDwNWXrzwXt9DXPFVA5QET when zeroShadow issued its Report.

294. zeroShadow noted that the abrupt change in the laundering pattern on this branch differed from the other movements and could indicate a change of hands to an unidentified service, although zeroShadow had not identified such a service at the time of the Report.

295. These remaining balances demonstrate both the precision and the limits of the tracing. Arena does not allege that every dollar of his loss was sent to ChangeNOW or PackDraw.

296. Rather, the investigation identifies the specific portions and transaction paths associated with particular services and separately identifies assets that remained elsewhere.

**O. The Effect of the Laundering Sequence on Arena's Property**

297. Arena has never authorized Doe, ChangeNOW, PackDraw, or the persons operating the recipient accounts to exercise ownership, dominion, or control over his cryptocurrency for Doe's benefit.

298. Arena received no consideration for any unauthorized transfer of his property after Doe obtained control of it.

299. Arena likewise received no consideration for the successive instant-exchange transactions, cross-chain conversions, PackDraw deposits, wagering activity, withdrawals, or other dispositions of the stolen assets or their traceable proceeds.

300. The laundering sequence did not merely change the digital addresses at which Arena's cryptocurrency was located.

301. Each successive transaction changed the practical circumstances of recovery.

302. The peel-chain transfers divided the original Bitcoin into smaller portions and moved the remaining balance through new addresses.

303. The instant-exchange transactions changed the form of the property.

304. The cross-chain swaps moved value from one blockchain to another.

305. The ChangeNOW-associated transactions converted stolen Bitcoin into different assets and transmitted outputs to new addresses, including addresses attributed to PackDraw.

306. The deposits into PackDraw moved substantial portions of the identifiable proceeds into customer-account infrastructure where the identity of the recipient could no longer be determined from blockchain information alone.

307. From that point forward, effective tracing and recovery depended upon internal records maintained by PackDraw concerning its customer accounts, KYC information, platform ledger, wagering activity, and withdrawal destinations.

308. PackDraw's failure to provide those records after actual notice has prevented Arena from determining the identity of the persons controlling the recipient accounts and the complete disposition of the Arena-linked assets after they entered PackDraw.

309. As a result of the conduct alleged herein, Arena has lost possession and use of substantial cryptocurrency, has suffered a substantial diminution in the recoverability of his property, and has incurred significant investigative and legal expenses attempting to trace the assets, identify Doe and the downstream recipients, preserve evidence, and obtain recovery.

310. Arena continues to seek identification of Doe, identification of the PackDraw account holders, preservation and production of the relevant transaction records, recovery of any remaining identifiable property or proceeds, and monetary and equitable relief against the persons and entities legally responsible for the conversion, laundering, receipt, and dissipation of his property.

## CAUSES OF ACTION

### I. COUNT I – CONVERSION (ARENA v. JOHN DOE)

311. Plaintiff repeats and realleges each of the preceding paragraphs as though fully set forth herein.

312. At all relevant times, Arena was the lawful owner of, and possessed the immediate and superior right to possess, control, use, transfer, and dispose of, the cryptocurrency that Doe wrongfully obtained, including approximately 2.8256166 BTC and 198,587.726 USDC and the identifiable cryptocurrency, substitute assets, and traceable proceeds into which that property was subsequently converted.

313. Arena's cryptocurrency constituted specific and identifiable personal property. The blockchain records identified above establish the particular transaction hashes, receiving addresses, amounts, and subsequent transaction paths through which Doe exercised control over Arena's property.

314. Arena never sold, gifted, assigned, transferred ownership of, or otherwise relinquished his property rights in the cryptocurrency to Doe. Arena likewise never authorized Doe to possess, transfer, exchange, convert, conceal, wager, encumber, dissipate, or otherwise exercise dominion or control over the cryptocurrency or its proceeds.

315. Doe nevertheless intentionally and wrongfully obtained control over Arena's cryptocurrency through the fraudulent scheme described above and thereafter exercised dominion over that property in a manner directly inconsistent with Arena's ownership rights.

316. Doe's exercise of dominion was immediate and unequivocal. After obtaining Arena's cryptocurrency, Doe caused the assets to be transferred from the initial receiving wallets to blockchain addresses, instant-exchange services, cross-chain services, and downstream platforms selected or controlled by Doe or persons acting with him.

317. Doe thereafter fragmented portions of Arena's Bitcoin through a peel-chain transaction pattern; repeatedly transmitted the property to new addresses; exchanged portions of the cryptocurrency through instant-swap services; converted the property into different digital assets; moved value across multiple blockchains; and routed substantial portions of the stolen assets toward downstream destinations, including the ChangeNOW-associated transactions and Pack-Draw deposits alleged above.

318. Those transactions were affirmative exercises of ownership and control over property belonging to Arena. By directing where the cryptocurrency would be sent, what assets it would be converted into, which blockchains it would traverse, and where the resulting proceeds would ultimately be deposited or monetized, Doe exercised the very rights of control and disposition that belonged exclusively to Arena.

319. Doe's possession of Arena's cryptocurrency was wrongful from its inception. Accordingly, Arena was not required to make a demand for return before Doe's conduct constituted conversion. In all events, Arena never consented to Doe's possession or disposition of the property and has continuously maintained his ownership claim.

320. Doe's successive transfers and conversions did not extinguish Arena's ownership interest. To the extent Doe exchanged Arena's original cryptocurrency for other cryptocurrency or other identifiable proceeds, those substitute assets constituted traceable proceeds of the property Doe had wrongfully converted.

321. The conversion was complete when Doe first intentionally exercised unauthorized dominion and control over Arena's cryptocurrency. Doe thereafter compounded the conversion by repeatedly transferring, exchanging, concealing, and dissipating the property and its traceable proceeds for the purpose of placing them beyond Arena's possession and recovery.

322. As a direct and proximate result of Doe's conversion, Arena was deprived of the possession, use, control, and economic value of cryptocurrency worth approximately $500,000 at the time of the theft.

323. Arena has also suffered legally recoverable consequential damages resulting from Doe's conversion, including damages associated with the loss and dissipation of the converted property and such additional damages as may be established through discovery and at trial.

324. Arena is entitled to recover from Doe the value of the converted property, together with pre-judgment and post-judgment interest, any other damages recoverable under Massachusetts law, and appropriate equitable relief concerning any identifiable cryptocurrency, substitute assets, or traceable proceeds remaining in Doe's possession, custody, or control.

## II. COUNT II – AIDING AND ABETTING CONVERSION (ARENA v. CHANGENOW)

325. Plaintiff repeats and realleges each of the preceding paragraphs as though fully set forth herein.

326. Doe committed the underlying tort of conversion by intentionally and without authorization exercising dominion and control over Arena's cryptocurrency, transferring it to addresses outside Arena's control, converting it into different digital assets, moving it across multiple blockchains, and continuing to conceal and dissipate the property and its traceable proceeds in a manner inconsistent with Arena's ownership rights.

327. ChangeNOW knowingly and substantially assisted that continuing conversion through the affirmative transaction conduct alleged above.

328. Arena does not predicate ChangeNOW's liability on a theory that ChangeNOW merely "should have known" that some unidentified customer might be engaged in wrongdoing, nor does Arena rely solely upon generalized allegations that cryptocurrency transactions

sometimes present money-laundering risks. Rather, Arena alleges ChangeNOW's actual knowledge circumstantially from the particularized and highly concentrated transaction activity involving Arena's identifiable stolen property and from the transaction-specific information available to ChangeNOW as the liquidity and execution provider for the identified swaps.

329. Within approximately thirty-two minutes on November 4, 2025, and only hours after Arena's Bitcoin was stolen, approximately 1.885 BTC of Arena's property—worth approximately $198,916 at the time—entered six separate transactions that zeroShadow expressly identified as "Houdiniswap (ChangeNow)."

330. Those six transactions were not independent, isolated transfers. They arose from the same continuing peel-chain movement of Arena's recently stolen Bitcoin, involved similarly structured portions of the same property, and repeatedly invoked the same HoudiniSwap/ChangeNOW liquidity relationship in rapid succession.

331. The corresponding withdrawal information demonstrates that the ChangeNOW-associated transaction legs did not simply receive and forward the same Bitcoin. Instead, they converted or transmitted Arena-linked value into different assets and across different blockchains, including Bitcoin sent to new addresses, DAI on Ethereum, ATOM on Cosmos, and ASTER on BNB Smart Chain.

332. At least two of those ChangeNOW-associated outputs were transmitted directly to 0xA872B21bc75fe07c4B7d41eb557c1072cDB0f7aF, an address that zeroShadow independently attributed to PackDraw. One transaction delivered approximately 41,339.75 DAI to that address, and another delivered approximately 36,357.63 ASTER on BNB Smart Chain.

333. Another ChangeNOW-associated transaction converted Arena-linked Bitcoin into approximately 14,235 ATOM and transmitted it to a Cosmos address. zeroShadow thereafter

traced those funds toward PackDraw through additional swaps and expressly identified two transactions on that downstream route as ChangeNOW transactions: A32AF475F27BB500AC91F8FA049ADCBB3682D5EAD5B27EE8F9DD0F2364A53D7B and 33454E6CF573FF4EDE78D959457EB927BA57A41EEA35439AE3BCB4D6FD6728E9.

334. zeroShadow also identified an additional HoudiniSwap withdrawal leg as "Houdiniswap (ChangeNow)" in which approximately 20,815 USDT was transmitted on BNB Smart Chain directly to 0x3eCAC8206d56F2428221945CD8410819e67B1Fb0, another address identified in zeroShadow's tracing as a PackDraw deposit address.

335. These transaction-specific facts support a strong inference that ChangeNOW was aware that its infrastructure was being repeatedly used as part of the same coordinated concealment and conversion sequence, rather than for a series of unrelated ordinary retail swaps.

336. On information and belief, ChangeNOW's role as liquidity and/or execution provider gave it access to information concerning the specific transactions that was not available from the public blockchain alone, including the service deposit addresses, amounts and timing of the inputs, requested output assets, destination addresses, transaction identifiers, counterparty information, wallet-risk information, and other transaction metadata transmitted through or generated by the HoudiniSwap/ChangeNOW integration.

337. On information and belief, ChangeNOW also maintained or had access to anti-money-laundering, blockchain-intelligence, transaction-monitoring, wallet-screening, or risk-management systems capable of generating wallet labels, risk scores, alerts, restrictions, or compliance reviews concerning the identified transactions.

338. The precise alerts, wallet labels, risk scores, transaction reviews, internal communications, counterparty information, and other facts bearing on ChangeNOW's actual knowledge are peculiarly within ChangeNOW's possession and will be established through discovery.

339. ChangeNOW's assistance was affirmative, not passive. ChangeNOW did not merely maintain an account into which Doe unilaterally deposited already-stolen assets, nor does Arena base this claim on ChangeNOW's failure to investigate or on the existence of any fiduciary duty owed to Arena.

340. Rather, ChangeNOW supplied the liquidity and transaction-execution infrastructure by which Arena-linked cryptocurrency was accepted into the identified swap legs, converted into different assets, moved across blockchains, and transmitted to new destination addresses.

341. Through that conduct, ChangeNOW affirmatively changed the form, blockchain, and destination of Arena's property and enabled Doe to continue transferring, concealing, aggregating, and dissipating the converted proceeds.

342. ChangeNOW's services therefore did more than make Doe's misconduct marginally easier. The identified swaps were the mechanisms through which substantial portions of Arena's stolen property were transformed and moved from one transaction environment to another, including transaction outputs sent directly or indirectly to PackDraw-attributed addresses.

343. The repeated ChangeNOW-associated conversions materially impaired Arena's ability to identify, restrain, and recover the specific property processed through ChangeNOW because each conversion substituted a new asset, address, blockchain, or transactional layer for the previously traceable property.

344. On information and belief, ChangeNOW knowingly continued to supply liquidity and execute or enable these transaction legs notwithstanding the transaction-specific facts

available to it and derived fees, spreads, liquidity-provider compensation, or other financial benefits from doing so.

345. ChangeNOW's affirmative conduct was therefore a substantial factor in Doe's continuing conversion of the particular Arena-linked assets that passed through ChangeNOW-associated infrastructure.

346. As a direct and proximate result of ChangeNOW's knowing and substantial assistance, Arena suffered injury with respect to the specific cryptocurrency and traceable proceeds processed through ChangeNOW, including continued deprivation of his property, further dissipation and conversion of the assets, diminished recoverability of the property, and such other consequential damages as are recoverable under Massachusetts law.

347. Arena is entitled to recover from ChangeNOW all compensatory and other damages available under Massachusetts law attributable to ChangeNOW's aiding and abetting of Doe's conversion, together with pre-judgment and post-judgment interest and such further legal and equitable relief as the Court deems just and proper.

## III. COUNT III – AIDING AND ABETTING CONVERSION (ARENA v. PACKDRAW)

348. Plaintiff repeats and realleges each of the preceding paragraphs as though fully set forth herein.

349. Doe committed the underlying tort of conversion by intentionally and without authorization exercising dominion and control over Arena's cryptocurrency, transferring that property away from Arena, converting it into different digital assets, moving it across multiple blockchains and intermediary services, and continuing to conceal, dissipate, and monetize the property and its traceable proceeds in a manner directly inconsistent with Arena's ownership rights.

350. PackDraw knowingly and substantially assisted that continuing conversion through the affirmative receipt, account-level processing, crediting, monetization, and disposition of substantial amounts of Arena's identifiable stolen property and traceable proceeds.

351. Arena does not predicate PackDraw's liability merely upon the fact that a stolen asset happened to arrive at a blockchain address associated with PackDraw, nor upon a generalized allegation that cryptocurrency-gaming platforms encounter suspicious transactions. The allegations against PackDraw concern repeated, transaction-specific deposits of Arena-linked property into PackDraw-attributed infrastructure and PackDraw's affirmative processing of those deposits through customer accounts under its control.

352. zeroShadow traced at least approximately $315,571.54 of Arena-linked cryptocurrency to PackDraw and identified thirteen PackDraw deposit transactions involving multiple different assets—including BTC, ETH, DAI, USDT, ASTER, and SOL—across Bitcoin, Ethereum, BNB Smart Chain, and Solana.

353. Those deposits were not a single fortuitous transfer. Multiple Arena-linked laundering branches repeatedly converged at PackDraw-attributed addresses over a period of days, including repeated deposits into the same PackDraw-attributed addresses and clusters of deposits occurring within short periods of time.

354. For example, the PackDraw-attributed address 0xA872B21bc75fe07c4B7d41eb557c1072cDB0f7aF received Arena-linked assets in multiple forms and on multiple blockchains, including approximately 10.22 ETH, approximately 41,339.75 DAI, and approximately 36,357.63 ASTER.

355. At least two of those deposits were direct outputs from transaction legs that zeroShadow identified as HoudiniSwap transactions using ChangeNOW liquidity: approximately 41,339.75 DAI on Ethereum and approximately 36,357.63 ASTER on BNB Smart Chain.

356. Another PackDraw-attributed address, 0x3eCAC8206d56F2428221945CD8410819e67B1Fb0, received multiple Arena-linked USDT deposits, including approximately 20,815 USDT through a withdrawal transaction that zeroShadow expressly labeled "Houdiniswap (ChangeNow)."

357. A separate PackDraw-attributed Ethereum address, 0xB2a7C74889725f56E8B340c82b0a165F2e954faB, received four Arena-linked ETH deposits on November 12, 2025—including approximately 8.53296 ETH, 8.594671 ETH, 1.44 ETH, and 14.15 ETH—within a period of less than one hour.

358. These transaction-specific facts support an inference that PackDraw was not an accidental or passive recipient of one isolated transfer, but the recurring platform destination at which substantial portions of Doe's fragmented laundering paths were aggregated into customer-account infrastructure controlled by PackDraw.

359. On information and belief, PackDraw generated, assigned, monitored, controlled, or otherwise utilized the identified deposit addresses to receive cryptocurrency attributable to particular customer account or accounts.

360. Upon receipt of the Arena-linked deposits, PackDraw did not merely leave the cryptocurrency at an unidentified external blockchain address. On information and belief, PackDraw's internal systems associated the deposits with customer account(s), credited corresponding cryptocurrency or platform value to those account(s), recorded the transactions on

PackDraw's internal ledger, and made the resulting value available for wagering, transfer, conversion, withdrawal, or other use through PackDraw's platform.

361. Those affirmative account-level acts constituted substantial assistance to Doe's continuing conversion. PackDraw's infrastructure transformed blockchain deposits of Arena's property into usable account value over which the recipient account holder could exercise practical control despite Arena's continuing ownership rights.

362. By crediting the recipient account(s) and making the deposited value available for subsequent platform activity, PackDraw enabled the stolen property and its substitute value to be wagered, transferred, converted, or withdrawn beyond Arena's control and beyond what could be determined through public blockchain tracing alone.

363. PackDraw's conduct therefore materially advanced the continuing conversion by providing the mechanism through which substantial portions of Arena's stolen cryptocurrency could be aggregated, monetized, and further disposed of after passing through the preceding laundering transactions.

364. Arena does not base substantial assistance upon PackDraw's mere failure to investigate suspicious activity, upon an alleged fiduciary duty to Arena, or upon passive inaction. The substantial assistance alleged is PackDraw's affirmative operation of the deposit, account-crediting, wagering, transfer, and withdrawal infrastructure through which the identified stolen property was made usable by the recipient account holder or holders.

365. PackDraw's actual knowledge is supported by the transaction-specific circumstances visible within its own account infrastructure, including repeated Arena-linked deposits involving multiple assets and blockchains, recurring PackDraw-attributed deposit addresses,

concentrated deposit activity, and the aggregation within PackDraw accounts of outputs originating through privacy-oriented, nested, and cross-chain swap transactions.

366. On information and belief, PackDraw possessed information unavailable from the public blockchain concerning those deposits, including the identity or KYC status of the recipient account holder or holders, internal account history, prior deposit and withdrawal activity, wagering activity, IP and device information, geographic information, transaction-risk information, and any compliance reviews or restrictions associated with the account(s).

367. Those internal records are uniquely within PackDraw's possession and will establish what PackDraw knew concerning the recipient accounts, the source and pattern of the deposits, the activity that followed receipt of Arena's property, and the disposition of the resulting account value.

368. Independently and in all events, by at least January 2026, PackDraw had actual notice that the specific cryptocurrency traced to its platform was claimed as stolen property belonging to Arena.

369. By that time, PackDraw had been informed of Arena's identity, his Massachusetts connection, the theft, the transaction tracing, and the PackDraw-attributed deposit addresses through which Arena-linked assets had entered its platform.

370. PackDraw was also informed that its internal KYC, account, transaction, and withdrawal records were necessary to identify the persons who had received and used Arena's property and to determine whether the stolen assets or their traceable proceeds remained recoverable.

371. From that point forward, PackDraw could not treat any remaining Arena-linked cryptocurrency, substitute assets, platform credits, or identifiable proceeds as property whose

ownership was unknown or undisputed. PackDraw had actual knowledge that an identified victim asserted a superior ownership interest in specifically traced property that had entered PackDraw's account infrastructure.

372. To the extent any Arena-linked cryptocurrency, substitute assets, platform balances, account credits, winnings, or identifiable proceeds remained within PackDraw's possession or control after PackDraw received that notice, any subsequent release, wagering, transfer, conversion, withdrawal, or other disposition of that property occurred with actual knowledge of Arena's adverse ownership claim.

373. Any such post-notice processing constituted additional affirmative assistance to the continuing conversion because PackDraw knowingly enabled property claimed by Arena to remain available for use or disposition by the recipient account holder rather than preserving it pending resolution of the ownership claim.

374. The timing and nature of any post-notice activity—including whether PackDraw froze the recipient accounts, what assets or account credits remained when notice was received, whether wagering continued, whether withdrawals were permitted, and where any withdrawals were sent—cannot be determined from public blockchain records and are peculiarly within PackDraw's possession.

375. Arena therefore pleads those post-notice matters on information and belief and will seek PackDraw's internal ledger, KYC records, transaction history, wagering records, withdrawal records, IP and device records, compliance records, account restrictions, and communications concerning Arena's notice and the identified deposits.

376. PackDraw has nevertheless failed to provide Arena with the identity of the recipient account holder or holders, complete KYC information, transaction history, wagering history,

withdrawal destinations, IP or device information, or other records necessary to identify the persons who controlled and benefited from Arena's property.

377. Arena does not allege that PackDraw's nondisclosure of records, standing alone, constitutes substantial assistance. Rather, that nondisclosure is relevant to PackDraw's knowledge, the information in its possession, the continuing concealment of the recipient's identity, and Arena's inability to determine the disposition of his property after it entered PackDraw.

378. On information and belief, PackDraw derived financial benefits from its processing and use of the Arena-linked deposits, including wagering revenue, house advantage, transaction fees, spreads, or other platform-related revenue.

379. PackDraw's affirmative acceptance, account crediting, processing, monetization, and, to the extent established through discovery, post-notice disposition of Arena-linked property were substantial factors in the continuing conversion and dissipation of the specific assets and proceeds that entered PackDraw's platform.

380. As a direct and proximate result of PackDraw's knowing and substantial assistance, Arena suffered injury with respect to the particular property processed through PackDraw, including continued deprivation of the cryptocurrency and its proceeds, further dissipation of the assets, diminished recoverability of the property, and the inability to identify and pursue the persons who received, controlled, wagered, withdrew, or otherwise benefited from his stolen assets.

381. Arena is entitled to recover from PackDraw all compensatory and other damages available under Massachusetts law attributable to PackDraw's aiding and abetting of Doe's conversion, together with pre-judgment and post-judgment interest and such further legal and equitable relief as the Court deems just and proper.

## IV. COUNT IV – AIDING AND ABETTING CONVERSION (ARENA v. FIXEDFLOAT)

382. Plaintiff repeats and realleges each of the preceding paragraphs as though fully set forth herein.

383. Doe committed the underlying tort of conversion by intentionally and without authorization exercising dominion and control over Arena's cryptocurrency and by continuing to transfer, exchange, conceal, and dissipate the property and its traceable proceeds.

384. FixedFloat knowingly and substantially assisted that continuing conversion through the affirmative transaction conduct alleged above.

385. The claim against FixedFloat is transaction-specific. zeroShadow traced approximately 0.116796 BTC from a ChangeNOW-associated withdrawal to bc1q443yxv00mgs9d6yaaat7kdwq7e9883lg2z4fdx and thereafter through two transactions it identified as FixedFloat transactions: e3a1253900664cefe6f82967249749dbbe9c3f5de3b3d532dbfcccb22773fda5 and d2447560c9a663338bdddb05aeb51d16c38e19e6ae82fa91bdfd492433db3218.

386. zeroShadow traced those transactions as part of a cross-chain path moving Arena-linked property from Bitcoin toward BNB Smart Chain and an address it suspected was associated with PackDraw.

387. Arena does not predicate substantial assistance on FixedFloat's mere failure to investigate or on any fiduciary duty. The substantial assistance alleged is FixedFloat's affirmative execution or enablement of the identified cross-chain conversion transactions.

388. On information and belief, FixedFloat's execution infrastructure accepted the Arena-linked input, recognized or controlled the applicable transaction deposit infrastructure,

performed or arranged the conversion, and caused corresponding output assets to be transmitted to a new destination address.

389. Those affirmative acts materially assisted Doe's continuing conversion by changing the blockchain, transactional form, and destination of Arena's identifiable property and by enabling the property to continue through the laundering path beyond Arena's control.

390. Arena alleges FixedFloat's actual knowledge from the particularized circumstances of the identified transactions and from information available to FixedFloat as the transaction provider, including the rapid movement of recently stolen property through a continuing chain-hop sequence, the relationship between the two identified FixedFloat transaction legs, the requested cross-chain conversion, destination information, and transaction-specific wallet-risk and compliance data.

391. On information and belief, FixedFloat maintained or had access to transaction-monitoring, blockchain-intelligence, wallet-screening, risk-scoring, or compliance systems capable of generating alerts or other information concerning the relevant transactions.

392. The precise transaction reviews, risk scores, wallet labels, alerts, counterparty information, and internal communications bearing on FixedFloat's actual knowledge are within FixedFloat's possession and will be established through discovery.

393. On information and belief, FixedFloat derived fees, spreads, or other financial benefits from the transactions it executed or enabled.

394. FixedFloat's knowing and affirmative assistance was a substantial factor in the continued conversion and dissipation of the specific Arena-linked property that passed through its transaction infrastructure.

395. As a direct and proximate result, Arena suffered injury with respect to the identifiable property processed through FixedFloat, including continued deprivation, further conversion and dissipation, and diminished recoverability of that property.

396. Arena is entitled to recover from FixedFloat all compensatory and other damages available under Massachusetts law attributable to FixedFloat's aiding and abetting of Doe's conversion, together with pre-judgment and post-judgment interest and such further relief as the Court deems just and proper.

## V. COUNT V – FRAUDULENT / VOIDABLE TRANSFER – G.L. c. 109A §§ 5(a)(1), 8 & 9 (ARENA v. JOHN DOE, CHANGENOW, FIXEDFLOAT & PACKDRAW)

397. Plaintiff repeats and realleges each of the preceding paragraphs as though fully set forth herein.

398. No later than the time Doe fraudulently obtained unauthorized control over Arena's cryptocurrency, Arena possessed claims against Doe for, among other things, fraud, conversion, return of the property, restitution, and damages. Arena therefore became a "creditor," and Doe became a "debtor," within the meaning of G.L. c. 109A before or contemporaneously with the transfers alleged below.

399. Arena's claims against Doe existed regardless of whether those claims had yet been reduced to judgment or liquidated in a fixed amount. Doe's immediate onward movement of the stolen property therefore constituted transfers made after Arena's creditor claim had arisen.

400. Immediately after obtaining unauthorized control over Arena's cryptocurrency, Doe began transferring the property and its traceable proceeds through successive blockchain addresses, instant exchangers, nested swap services, cross-chain protocols, ChangeNOW-associated transaction infrastructure, and PackDraw-attributed deposit addresses.

401. Doe made those transfers with actual intent to hinder, delay, and defraud Arena in the recovery of his property and satisfaction of his claims, within the meaning of G.L. c. 109A, § 5(a)(1).

402. Doe's actual fraudulent intent is demonstrated by the objective circumstances surrounding the transfers and by multiple badges of fraud recognized under G.L. c. 109A, § 5(b).

403. First, the transfers commenced almost immediately after the theft. Arena's approximately 2.8256166 BTC and 198,587.726 USDC were taken shortly after midnight UTC on November 4, 2025, and Doe promptly began moving the assets through new addresses, exchanges, swaps, bridges, and other services rather than retaining them at the initial receiving addresses.

404. Second, Doe deliberately fragmented the stolen Bitcoin through a peel-chain pattern in which portions of the property were repeatedly separated from the remaining balance and routed to different service deposit addresses while the balance continued through newly utilized addresses.

405. Third, Doe repeatedly changed the form of Arena's property. Rather than merely transferring the original BTC and USDC from one address to another, Doe caused the assets and their proceeds to be converted into multiple different cryptocurrencies, including BTC, DAI, ATOM, ASTER, ETH, USDT, SOL, and other substitute assets.

406. Fourth, Doe repeatedly moved Arena-linked value across different blockchains, including Bitcoin, Ethereum, BNB Smart Chain, Cosmos, and Solana, thereby creating additional transaction layers between Arena and his property.

407. Fifth, Doe used instant exchangers, nested swap services, privacy-oriented transaction infrastructure, and cross-chain services specifically suited to separating an input transaction from a differently denominated or differently located output transaction.

408. Sixth, Doe repeatedly moved the property through pseudonymous blockchain addresses from which Doe's identity could not be determined through the public blockchain.

409. Seventh, the transfers were structured so that Doe or persons acting with Doe retained practical control over the property and its proceeds while repeatedly changing their form, location, address, and blockchain.

410. Eighth, substantial portions of the stolen property were ultimately routed into PackDraw-attributed cryptocurrency deposit addresses and, on information and belief, credited to non-public customer account(s), after which the natural person controlling the corresponding account value could no longer be identified through blockchain tracing alone.

411. Ninth, the sequence occurred in a compressed period immediately following the creation of Arena's claims against Doe and was followed by continued movement and dissipation of the property, strongly supporting the inference that the purpose of the transfers was to place the assets beyond Arena's practical reach before they could be identified, restrained, or recovered.

412. Arena received no consideration whatsoever for any of these transfers. The transactions were undertaken exclusively through Doe's unauthorized exercise of dominion over Arena's property.

413. The circumstances of the transfers are incompatible with ordinary management or investment of cryptocurrency. Their timing, fragmentation, repeated changes in asset and blockchain, use of nested and privacy-oriented transaction services, movement through pseudonymous

addresses, and ultimate routing into non-public platform accounts collectively demonstrate a deliberate effort to hinder, delay, and defraud Arena as a creditor.

414. As detailed above, ChangeNOW was a transferee, immediate transferee, mediate transferee, and/or participant in transfers of Arena-linked property and traceable proceeds to the extent cryptocurrency entered the identified ChangeNOW-associated transaction legs and substitute cryptocurrency emerged through ChangeNOW's liquidity and execution infrastructure.

415. In particular, approximately 1.885 BTC of Arena's stolen Bitcoin entered six transactions that zeroShadow expressly identified as HoudiniSwap transactions using ChangeNOW liquidity within approximately thirty-two minutes on November 4, 2025.

416. The resulting transaction legs converted or transmitted the property into different assets and blockchains, including DAI on Ethereum, ATOM on Cosmos, ASTER on BNB Smart Chain, and Bitcoin sent to new addresses. At least two resulting outputs were transmitted directly to a PackDraw-attributed address, and zeroShadow identified additional downstream transactions on the Cosmos-to-PackDraw route as ChangeNOW transactions.

417. FixedFloat likewise was an immediate and/or mediate transferee of Arena-linked property and traceable proceeds to the extent the identified Bitcoin entered FixedFloat-controlled transaction infrastructure and substitute cryptocurrency emerged through the two FixedFloat transactions identified above.

418. The FixedFloat path involved a portion of the same recently stolen property moving from Bitcoin through cross-chain conversion toward BNB Smart Chain and a suspected PackDraw destination. The precise value and output assets associated with each FixedFloat transaction, and the consideration FixedFloat contends it supplied, are matters to be established through FixedFloat's records and discovery.

419. PackDraw likewise was an immediate and/or mediate transferee of Arena-linked property and traceable proceeds to the extent the assets were deposited into the PackDraw-attributed addresses identified above and, on information and belief, credited to customer accounts maintained through PackDraw's platform.

420. zeroShadow traced at least approximately $315,571.54 of Arena-linked cryptocurrency to PackDraw and identified thirteen PackDraw deposit transactions involving multiple assets and blockchains.

421. Those transfers repeatedly converged at PackDraw-attributed infrastructure rather than terminating randomly at unrelated third-party addresses. On information and belief, PackDraw associated the deposits with customer account(s), credited corresponding platform value, and thereafter permitted the resulting value to be held, wagered, transferred, converted, or withdrawn.

422. Arena alleges that ChangeNOW did not receive the relevant transfers in good faith. As alleged above, the six ChangeNOW-liquidity inputs occurred within approximately thirty-two minutes during the same peel-chain laundering sequence involving recently stolen Bitcoin; ChangeNOW-associated transaction legs repeatedly changed the asset, blockchain, and destination of that property; multiple outputs proceeded directly or indirectly toward PackDraw; and ChangeNOW possessed transaction-specific information concerning the identified swaps that was unavailable to Arena from the public blockchain.

423. Arena further alleges, on information and belief, that ChangeNOW possessed or had access to wallet-screening, transaction-monitoring, blockchain-intelligence, risk-scoring, counterparty, and compliance information bearing directly on whether the transactions involved criminally derived property. The precise information available to ChangeNOW, and the

consideration ChangeNOW claims to have provided in connection with each transfer, are matters peculiarly within ChangeNOW's possession and will be established through discovery.

424. Arena also alleges that FixedFloat did not receive the relevant transfers in good faith. The identified FixedFloat transactions occurred within the same rapid post-theft laundering sequence, involved cross-chain conversion of specifically traced Arena-linked property, and were executed with access to transaction-specific source, destination, wallet-risk, and compliance information unavailable to Arena from the public blockchain alone.

425. The precise information available to FixedFloat and the value it contends it furnished are matters within FixedFloat's possession. Arena reserves the right to challenge any good-faith or value defense after discovery of FixedFloat's transaction and compliance records.

426. Arena likewise alleges that PackDraw did not receive and retain the relevant transfers in good faith. The transaction sequence involved repeated deposits across different assets and blockchains, recurring PackDraw-attributed deposit addresses, substantial transaction values, and aggregation of outputs originating through nested, privacy-oriented, and cross-chain swap services into PackDraw's customer-account infrastructure.

427. Independently, by at least January 2026 PackDraw had actual notice that specifically identified assets transmitted into PackDraw constituted property stolen from Arena, that Arena was asserting an ownership and recovery claim to that property, and that PackDraw's internal account records were necessary to identify the recipient and determine the subsequent disposition of the property.

428. Accordingly, whatever PackDraw may contend regarding its knowledge at the moment of the original November 2025 deposits, PackDraw could not thereafter act in good faith with respect to Arena-linked cryptocurrency, substitute assets, account credits, winnings, or

identifiable proceeds that remained in its possession or control after it received actual notice of Arena's ownership claim.

429. To the extent PackDraw thereafter permitted such property or identifiable proceeds to be wagered, transferred, converted, released, or withdrawn, those post-notice transactions constituted additional transfers of property undertaken with actual knowledge of Arena's adverse claim.

430. The applicability of any defense based upon good faith or reasonably equivalent value depends upon facts concerning the Defendants' knowledge, consideration, internal treatment of the transactions, subsequent disposition of the property, and account activity. Those facts are principally or exclusively contained in Defendants' internal records and cannot be determined from the public blockchain alone.

431. Arena specifically denies that the provision of transaction services, substitute cryptocurrency, gaming credits, or other platform functionality necessarily establishes either good faith or reasonably equivalent value for purposes of G.L. c. 109A. Arena reserves the right to challenge both elements based upon the complete factual record.

432. In the alternative, and to avoid any inconsistency concerning title to the original stolen cryptocurrency, Arena pleads this Count with respect to any interest Doe acquired in substitute property, exchanged cryptocurrency, transaction outputs, account balances, platform credits, wagering balances, winnings, or other proceeds generated through Doe's exercise of control over Arena's property and thereafter transferred with actual intent to hinder, delay, or defraud Arena.

433. Thus, to the extent the Court determines that Arena retained title to the original stolen cryptocurrency such that the original property itself was not an "asset" of Doe within the

meaning of Chapter 109A, Arena alternatively alleges that the statute applies to Doe's interests in any substitute or derivative assets, proceeds, account credits, or other property acquired through the exchange, conversion, monetization, or disposition of the stolen cryptocurrency and thereafter transferred through ChangeNOW, PackDraw, or other recipients.

434. This alternative pleading does not concede that Doe acquired lawful title to any stolen cryptocurrency or its proceeds. Arena expressly maintains his superior ownership, restitutionary, and tracing rights in the original property and any identifiable substitutes or proceeds.

435. Under G.L. c. 109A, § 8, Arena is entitled to avoidance of the voidable transfers to the extent necessary to satisfy his claims against Doe.

436. Arena is further entitled to all additional remedies authorized by Chapter 109A and other applicable law, including attachment or other provisional relief against transferred property and other property of liable transferees; an injunction against further disposition of transferred assets, substitute assets, account credits, or proceeds; and execution, levy, or other relief against transferred property or its proceeds.

437. To the extent the transferred property has been converted, commingled, wagered, withdrawn, dissipated, or otherwise cannot be returned in specie, Arena seeks a monetary judgment against each transferee or mediate transferee liable under G.L. c. 109A, § 9, up to the value recoverable under the statute and subject to the statutory rules governing transferee liability.

438. Arena additionally seeks a constructive trust, equitable lien, tracing relief, and all other remedies available at law or in equity over identifiable cryptocurrency, substitute assets, account credits, proceeds, or benefits derived from the voidable transfers.

439. The precise amount of Arena-linked property received by each Defendant, the value of substitute assets, the identity of subsequent transferees, the amount of property

remaining under Defendants' control, the consideration allegedly furnished by Defendants, and the complete disposition of the transferred assets are matters to be established through discovery.

440. Arena therefore requests judgment against Doe, ChangeNOW, FixedFloat, and PackDraw to the fullest extent permitted by G.L. c. 109A, including avoidance of the transfers, recovery from liable transferees, provisional and injunctive relief necessary to prevent further disposition, and all additional legal and equitable relief necessary to satisfy Arena's claims.

## VI. COUNT VI – EQUITABLE RESTITUTION / UNJUST ENRICHMENT (ARENA v. PACKDRAW)

441. Plaintiff repeats and realleges each of the preceding paragraphs as though fully set forth herein.

442. Arena was and remains the lawful owner of the cryptocurrency wrongfully obtained and transferred by Doe, including the identifiable cryptocurrency, substitute digital assets, account credits, and traceable proceeds into which that property was subsequently converted.

443. Doe's unauthorized transfers did not extinguish Arena's superior ownership and restitutionary interest in the property or in identifiable substitute assets and proceeds traceable to that property.

444. As alleged above, zeroShadow traced at least approximately $315,571.54 of Arena-linked cryptocurrency and proceeds into deposit addresses attributed to PackDraw.

445. Those deposits consisted of multiple assets—including BTC, ETH, DAI, USDT, ASTER, and SOL—transmitted across multiple blockchains and through multiple laundering paths before converging at PackDraw-attributed infrastructure.

446. On information and belief, PackDraw accepted the Arena-linked cryptocurrency into its platform, associated the deposits with customer account or accounts, credited

corresponding cryptocurrency or platform value to those accounts, and thereafter made the resulting value available for wagering, transfer, conversion, withdrawal, or other use.

447. PackDraw therefore obtained possession, control, use, or economic benefit from property and proceeds in which Arena retained the superior ownership and equitable interest.

448. Arena did not authorize PackDraw to receive, retain, credit, use, wager, convert, monetize, or permit withdrawal of his cryptocurrency or its traceable proceeds.

449. Arena received no consideration from PackDraw in exchange for PackDraw's receipt, processing, use, or monetization of the Arena-linked property.

450. PackDraw nevertheless obtained economic benefits arising directly from the receipt and use of Arena-linked cryptocurrency, including, on information and belief, platform fees, transaction fees, spreads, wagering revenue, house advantage, increased wagering volume, or other benefits generated through activity funded by the stolen property.

451. This Count is pleaded principally as a claim for equitable restitution of specific, identifiable property and its traceable proceeds, including substitute assets, internal account credits, platform balances, wagering balances, withdrawal proceeds, and other property derived from the cryptocurrency wrongfully transferred to PackDraw.

452. Arena seeks restitution because PackDraw received or controlled property in which Arena possessed a superior equitable and ownership interest, not because Arena voluntarily entered into a transaction with PackDraw or intentionally conferred a payment or contractual benefit upon it.

453. Accordingly, the fact that Doe physically transmitted the cryptocurrency to PackDraw does not alter the basis of Arena's restitutionary claim. Doe had no authority to transfer Arena's ownership interest for Doe's own benefit, and PackDraw's receipt of the property did

not eliminate Arena's right to follow identifiable stolen property and its proceeds into the hands of downstream recipients to the extent permitted by law.

454. In the alternative, to the extent the Court analyzes PackDraw's retention of benefits under Massachusetts unjust-enrichment principles, PackDraw was enriched through its receipt, processing, crediting, use, and monetization of Arena-linked cryptocurrency and the proceeds generated from that property.

455. PackDraw appreciated and retained those benefits through its internal account and transaction infrastructure.

456. PackDraw's retention became independently inequitable no later than January 2026, when PackDraw received actual notice that specifically identified cryptocurrency transmitted into its platform constituted property stolen from Arena.

457. By that time, PackDraw had been informed of Arena's identity, Arena's ownership claim, the tracing of his cryptocurrency into PackDraw-attributed deposit addresses, and the need to identify the recipient account holders and determine the subsequent disposition of the property.

458. From that point forward, PackDraw could not reasonably treat any remaining Arena-linked cryptocurrency, substitute assets, platform credits, wagering balances, winnings, fees derived from the property, or identifiable proceeds as property to which no competing ownership claim existed.

459. To the extent any Arena-linked property or identifiable proceeds remained within PackDraw's possession, custody, or control after PackDraw received actual notice, PackDraw's continued retention of that property without restoring it to Arena was inequitable.

460. To the extent PackDraw thereafter permitted the property or its substitute value to be wagered, transferred, converted, released, or withdrawn, PackDraw enabled the continued disposition of property after it had actual notice of Arena's superior claim.

461. Likewise, to the extent PackDraw retained fees, wagering revenue, spreads, house advantage, or other economic benefits generated from Arena-linked property after receiving notice of the theft, retention of those benefits would unjustly allow PackDraw to profit from property that it knew was claimed by the victim of the underlying fraud and conversion.

462. The precise amount and form of Arena-linked property received by PackDraw, the internal account credits generated from those deposits, any wagering proceeds or substitute balances, fees or other revenue PackDraw obtained, and the assets or proceeds remaining after PackDraw received notice are matters reflected in PackDraw's internal records and will be established through discovery.

463. Those records include, among other things, PackDraw's internal ledger, deposit records, account balances, wagering history, transfer history, withdrawal history, wallet records, KYC records, IP and device records, and records identifying any fees, commissions, spreads, house revenue, or other benefits derived from the Arena-linked deposits.

464. Equity and good conscience do not permit PackDraw to retain identifiable property belonging to Arena, substitute assets or proceeds derived from that property, or benefits generated from its unauthorized use where PackDraw knew or subsequently learned of Arena's superior ownership claim.

465. Arena is therefore entitled to restitution of any identifiable Arena-linked cryptocurrency, substitute assets, account credits, platform balances, proceeds, or other property remaining in PackDraw's possession, custody, or control.

466. Arena is further entitled, where the requirements of equity are satisfied, to the imposition of a constructive trust over identifiable Arena-linked property and traceable proceeds, including substitute cryptocurrency, platform credits, wagering balances, withdrawal proceeds, and other assets derived from the property.

467. To the extent PackDraw has transferred, commingled, converted, wagered, dissipated, or otherwise disposed of the original cryptocurrency, Arena seeks restitution and disgorgement of traceable substitute assets and benefits to the fullest extent permitted by law.

468. Arena further seeks disgorgement of any fees, wagering revenue, spreads, house advantage, transaction revenue, or other economic gains that PackDraw obtained from the use or disposition of Arena-linked property and that equity does not permit PackDraw to retain.

469. Arena lacks an adequate remedy at law to the extent the original cryptocurrency was converted into different digital assets, credited to internal platform accounts, commingled with other assets, wagered, transferred, withdrawn, or otherwise transformed in a manner that prevents return of the original property in specie.

470. The availability of legal damages against Doe does not provide an adequate substitute for restitution from PackDraw to the extent PackDraw possesses or benefited from specific property or identifiable proceeds traceable to Arena's cryptocurrency.

471. Arena therefore requests judgment against PackDraw requiring restitution of identifiable Arena-linked property and proceeds, disgorgement of benefits unjustly retained, imposition of a constructive trust or other appropriate equitable lien over traceable assets, an accounting sufficient to identify the property and benefits received by PackDraw, pre-judgment and post-judgment interest, and such other legal and equitable relief as the Court deems just and proper.

## VII. COUNT VII – CIVIL RICO – 18 U.S.C. §§ 1962(c) & 1964(c) (ARENA v. CHANGENOW & PACKDRAW)

472. Plaintiff repeats and realleges each of the preceding paragraphs as though fully set forth herein.

473. ChangeNOW and PackDraw are each "persons" within the meaning of 18 U.S.C. § 1961(3) and are capable of being held liable under 18 U.S.C. § 1962(c).

474. Arena alleges an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Doe Laundering Enterprise") consisting of Doe, the persons controlling the threat-actor wallets and recipient platform accounts, and those transaction participants who knowingly joined in the repeated conversion, concealment, transmission, and monetization of stolen crypto-currency, including ChangeNOW and PackDraw as alleged herein.

475. The Doe Laundering Enterprise was distinct from ChangeNOW and PackDraw individually. Each Defendant was a separate RICO "person," while the enterprise consisted of the relationships among Doe, the persons controlling the relevant wallets and accounts, and the participants knowingly engaged in carrying out the laundering and monetization sequence alleged herein.

476. The enterprise possessed the characteristics of an association-in-fact enterprise: a common purpose, relationships among its participants, and sufficient longevity to permit those participants to pursue the enterprise's purpose.

477. The enterprise's common purpose was to conceal the source, ownership, location, and control of cryptocurrency obtained through fraud; convert that cryptocurrency into substitute assets and move it across multiple blockchains; place successive transaction layers between the stolen property and its lawful owner; and monetize or dissipate the proceeds before Arena could identify, restrain, or recover them.

478. The relationships among the enterprise participants were manifested through the threat-actor-controlled blockchain addresses, the repeated HoudiniSwap/ChangeNOW transaction legs, the liquidity and execution relationships necessary to complete those swaps, the downstream wallet addresses, the PackDraw recipient accounts, and the successive transactions through which Arena's property was converted and monetized.

479. The enterprise existed for a period sufficient to accomplish repeated transactions involving the theft proceeds. The laundering did not occur through one instantaneous transfer. It proceeded through a sequence of peel-chain movements, instant swaps, cross-chain conversions, substitute assets, repeated ChangeNOW-associated transaction legs, and multiple deposits into PackDraw-attributed infrastructure over a period of days and thereafter through the continuing disposition of the resulting property and account value.

480. The enterprise and its activities affected interstate and foreign commerce. The scheme involved a Massachusetts victim, internet and telephone communications, globally accessible cryptocurrency platforms, foreign entities, multiple blockchain networks, cross-chain transactions, and the transmission and conversion of hundreds of thousands of dollars in digital assets.

**A. ChangeNOW's Participation in the Enterprise**

481. ChangeNOW knowingly participated, directly or indirectly, in the conduct of the enterprise's affairs through the affirmative transaction activity alleged above.

482. Arena does not allege that ChangeNOW participated in the enterprise merely because Doe happened to use a generally available website or because ChangeNOW provided routine services without knowledge of their purpose.

483. Rather, Arena alleges that ChangeNOW repeatedly supplied the liquidity and execution infrastructure through which substantial portions of the same recently stolen property were converted and transmitted during the concentrated laundering sequence.

484. Within approximately thirty-two minutes on November 4, 2025, approximately 1.885 BTC of Arena's recently stolen Bitcoin, worth approximately $198,916 at the time, entered six transactions that zeroShadow expressly attributed to HoudiniSwap transactions using ChangeNOW liquidity.

485. ChangeNOW-associated transaction infrastructure thereafter produced outputs in multiple forms and on multiple blockchains, including Bitcoin sent to new addresses, DAI on Ethereum, ATOM on Cosmos, and ASTER on BNB Smart Chain.

486. At least two such outputs were transmitted directly to an address independently attributed by zeroShadow to PackDraw, and additional ChangeNOW-associated outputs were traced through further transactions toward PackDraw.

487. zeroShadow further expressly attributed two additional transactions on the downstream Cosmos-to-PackDraw path to ChangeNOW and identified an additional outbound HoudiniSwap transaction as "Houdiniswap (ChangeNow)" that transmitted Arena-linked USDT directly to another PackDraw-attributed address.

488. Through those acts, ChangeNOW did not merely control its own internal bookkeeping. On information and belief, ChangeNOW exercised transaction-level discretion over whether the relevant swap legs would be executed, supplied the liquidity required for their execution, determined or implemented the form of the outputs, and caused or enabled the resulting assets to be transmitted to new destination addresses.

489. By repeatedly using that transaction infrastructure to effect the conversions through which the enterprise moved and concealed Arena's property, ChangeNOW participated in directing at least part of the enterprise's laundering affairs and purposefully caused the enterprise to accomplish transaction steps necessary to the conversion and concealment of the particular assets processed through ChangeNOW.

490. Arena alleges ChangeNOW's knowledge from the particularized circumstances described above, including the common source of the assets, the concentrated timing of the transactions, the peel-chain movement of the stolen Bitcoin, the repeated use of the same HoudiniSwap/ChangeNOW relationship, the multi-asset and multi-chain outputs, the direct and indirect movement of outputs toward PackDraw, and the transaction-specific information available to ChangeNOW as liquidity and execution provider.

491. On information and belief, ChangeNOW also possessed or had access to wallet-screening information, transaction-risk information, blockchain-intelligence data, counterparty information, alerts, risk scores, or other transaction metadata bearing on the source and purpose of the transaction sequence.

**B. PackDraw's Participation in the Enterprise**

492. PackDraw likewise knowingly participated, directly or indirectly, in conducting the enterprise's affairs through the affirmative receipt, account crediting, processing, monetization, and disposition of Arena-linked cryptocurrency.

493. zeroShadow traced at least approximately $315,571.54 of Arena-linked cryptocurrency to PackDraw and identified thirteen deposit transactions spanning Bitcoin, Ethereum, BNB Smart Chain, and Solana and involving BTC, ETH, DAI, USDT, ASTER, and SOL.

494. Those transactions repeatedly converged at PackDraw-attributed deposit addresses rather than arriving through one isolated transfer.

495. On information and belief, PackDraw generated, assigned, controlled, or monitored the recipient deposit addresses, associated the deposits with customer account or accounts, credited corresponding cryptocurrency or platform value, and made that value available for wagering, transfer, conversion, or withdrawal.

496. PackDraw thereby supplied the monetization infrastructure through which fragmented and converted cryptocurrency proceeds could be aggregated into customer-account value and thereafter used or withdrawn by the persons controlling the recipient accounts.

497. PackDraw's participation was therefore not limited to passive receipt of cryptocurrency. Its account infrastructure affirmatively changed the practical disposition of the property by converting public blockchain deposits into non-public account balances capable of being wagered, transferred, monetized, or withdrawn.

498. Arena alleges PackDraw's knowledge from the transaction-specific circumstances alleged above and from the information available within PackDraw's own account systems, including repeated deposits across different assets and blockchains, recurring recipient addresses, concentrated deposit activity, the aggregation of outputs derived from nested and privacy-oriented swap services, customer identity and KYC information, IP and device information, transaction history, withdrawal destinations, and compliance or risk information.

499. Independently, no later than January 2026 PackDraw acquired actual notice that specifically identified cryptocurrency deposited through its platform was claimed as property stolen from Arena.

500. At that point PackDraw knew the identity and Massachusetts location of the victim, the asserted ownership interest, the identified deposit transactions, and the need to preserve the recipient-account information and any remaining recoverable property.

501. To the extent Arena-linked cryptocurrency, substitute assets, platform credits, wagering balances, or identifiable proceeds remained within PackDraw's possession or control after that notice, any subsequent wagering, transfer, conversion, release, withdrawal, or dissipation occurred with actual knowledge of the criminal source and Arena's adverse ownership claim.

**C. Racketeering Activity and Money-Laundering Predicates**

502. The cryptocurrency obtained from Arena constituted proceeds of Doe's underlying fraudulent scheme, including conduct constituting or involving wire fraud within 18 U.S.C. § 1343 and other specified unlawful activity to the extent established through discovery and at trial.

503. ChangeNOW and PackDraw thereafter conducted or participated in repeated financial transactions involving property derived from that unlawful activity.

504. Arena alleges, based upon the particularized facts set forth above and on information and belief as to matters within Defendants' exclusive knowledge, that multiple ChangeNOW transactions constituted laundering transactions under 18 U.S.C. § 1956(a)(1)(B)(i) because ChangeNOW conducted or participated in financial transactions involving proceeds of unlawful activity while knowing that the property represented proceeds of some form of unlawful activity and while knowing that the transactions were designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or control of those proceeds.

505. The repeated ChangeNOW-associated conversions were suited to and, as used here, accomplished precisely that concealment function: portions of stolen Bitcoin entered the transaction infrastructure and emerged as different assets, on different blockchains, at different addresses, creating successive transactional layers between Arena's original property and the persons controlling the resulting proceeds.

506. Arena similarly alleges, on information and belief and based upon the transaction-specific facts pleaded herein, that PackDraw conducted or participated in financial transactions involving criminally derived property through the receipt, account crediting, monetization, transfer, and disposition of the Arena-linked deposits while possessing the knowledge alleged above.

507. To the extent the evidence establishes that PackDraw knowingly conducted post-notice transactions designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of Arena-linked proceeds, those transactions independently constitute violations of 18 U.S.C. § 1956(a)(1)(B)(i).

508. Arena further alleges that qualifying transactions exceeding $10,000 constituted transactions in criminally derived property in violation of 18 U.S.C. § 1957 to the extent all statutory requirements, including the applicable monetary-transaction and financial-institution requirements, are established through discovery and at trial.

509. The precise internal transaction records, counterparty data, risk information, wallet labels, account-crediting records, withdrawal records, and other evidence establishing Defendants' knowledge and the design and execution of each predicate transaction are principally within ChangeNOW's and PackDraw's possession.

510. Each qualifying violation of 18 U.S.C. §§ 1956 or 1957 constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

**D. Pattern, Relatedness, and Continuity**

511. The predicate acts were related because they involved the same victim property, the same threat actor and associated wallets, overlapping transaction participants, a common laundering and monetization purpose, common methods of instant swapping and cross-chain conversion, and common downstream recipient infrastructure.

512. The conduct was not a single transaction. It consisted of repeated financial transactions through multiple services, assets, blockchains, addresses, and platform accounts.

513. The ChangeNOW-associated conduct alone involved at least six concentrated inbound transaction legs, corresponding outbound transactions, additional downstream ChangeNOW transactions, and another transaction leg attributed by zeroShadow to HoudiniSwap using ChangeNOW.

514. PackDraw received at least thirteen identified Arena-linked deposits across multiple assets and blockchains, together with associated internal account-crediting and disposition activity that remains to be established through PackDraw's records.

515. The racketeering activity also presented a threat of repetition. zeroShadow reported that one threat-actor address involved in the laundering sequence had previously received other funds suspected to originate from other victims.

516. The transaction infrastructure through which the alleged laundering occurred was not created solely for one transaction and did not cease to exist after Arena's property was processed. ChangeNOW's liquidity infrastructure and PackDraw's deposit and account infrastructure remained available for repeated cryptocurrency transactions of the same general type.

517. On information and belief, the laundering methods alleged herein were capable of repetition whenever additional stolen cryptocurrency was routed through the same transaction infrastructure.

518. Arena therefore alleges an open-ended threat of continued racketeering activity and, alternatively, such pattern and continuity as may be established by discovery concerning other transactions involving the identified wallets, recipient accounts, transaction counterparties, and associated infrastructure.

**E. Direct Injury and Proximate Cause**

519. Arena's RICO claim is not premised solely upon the proposition that ChangeNOW or PackDraw caused Doe's antecedent fraud.

520. Doe's initial fraud caused the first unauthorized transfer of Arena's cryptocurrency. The racketeering acts alleged against ChangeNOW and PackDraw thereafter inflicted additional and direct injury upon Arena's continuing property interests in the specific, identifiable assets and proceeds that each Defendant processed.

521. Immediately before each ChangeNOW-associated transaction, Arena retained an ownership and recovery interest in identifiable cryptocurrency capable of being traced to the preceding blockchain address.

522. ChangeNOW's alleged laundering transactions directly changed the form, blockchain, and destination of that property, transmitted the substitute assets to new addresses, and thereby caused the particular property processed through its infrastructure to become further removed from Arena's possession and recovery.

523. PackDraw's alleged processing likewise caused identifiable blockchain deposits to become internal account value capable of being wagered, transferred, converted, or withdrawn by the recipient account holders.

524. The relevant injury is therefore tied to Defendants' own disposition of specific Arena property: the unauthorized conversion, transformation, transmission, monetization, and dissipation of identifiable assets and traceable proceeds in which Arena possessed the immediate ownership and recovery interest.

525. Arena is the direct victim of that injury. No person stands between Arena and the property interest injured by the alleged laundering transactions, and no more directly injured

plaintiff exists with respect to the identified Arena-linked cryptocurrency processed by ChangeNOW and PackDraw.

526. Arena therefore seeks damages attributable to the specific property processed and dissipated through Defendants' racketeering conduct, rather than attempting to impose upon either Defendant liability for portions of the original loss wholly unrelated to its conduct.

527. As a direct and proximate result of the alleged racketeering activity, Arena suffered injury to his business or property, including loss of possession and value of identifiable cryptocurrency and proceeds, unauthorized transformation and dissipation of that property, and loss of recoverable property caused by the specific transactions alleged herein.

### F. Domestic Injury

528. Arena's injury to property was domestic within the meaning of 18 U.S.C. § 1964(c).

529. Arena was located in Massachusetts, owned and exercised control over the cryptocurrency from Massachusetts before the theft, maintained his possessory and economic interests in the property from Massachusetts, and suffered the deprivation of those property interests in Massachusetts.

530. The effects of Defendants' subsequent transactions upon Arena's property—including the loss of possession, use, value, and recoverability of the identifiable assets processed by Defendants—were suffered by Arena in Massachusetts.

### G. RICO Damages and Relief

531. ChangeNOW and PackDraw, through the conduct alleged above, violated 18 U.S.C. § 1962(c) by conducting or participating, directly or indirectly, in the conduct of the Doe Laundering Enterprise's affairs through a pattern of racketeering activity.

532. Arena was injured in his property "by reason of" those violations within the meaning of 18 U.S.C. § 1964(c).

533. Arena seeks only those damages for which the evidence establishes the direct causal connection required by § 1964(c), including damages attributable to the identifiable cryptocurrency and proceeds processed, converted, monetized, or dissipated through each Defendant's racketeering activity.

534. Pursuant to 18 U.S.C. § 1964(c), Arena is entitled to recover threefold the damages he proves were sustained by reason of Defendants' RICO violations, together with the costs of this action and reasonable attorneys' fees.

535. Arena further seeks pre-judgment and post-judgment interest to the extent permitted by law and such additional legal or equitable relief as the Court determines appropriate.

## VIII. COUNT VIII – NEGLIGENCE (ARENA v. COINBASE GLOBAL, INC. & COINBASE, INC.) – STAYED PENDING ARBITRATION

536. Plaintiff repeats and realleges each of the preceding paragraphs as though fully set forth herein. This Count is subject to the existing stay pending arbitration and is repleaded solely to preserve Arena's claim in this superseding Complaint.

537. Coinbase designed, offered, and maintained the Coinbase Wallet environment through which consumers could store, receive, manage, import, and transfer digital assets.

538. Coinbase owed Arena a duty to exercise reasonable care in the design and security of wallet features governing wallet import, wallet association, access authorization, user verification, and warnings concerning foreseeable risks of unauthorized wallet control.

539. That duty included the obligation to employ reasonable safeguards commensurate with the foreseeable risks of phishing, credential compromise, seed-phrase theft, unauthorized wallet import, and social-engineering attacks targeting cryptocurrency users.

540. Prior to the events at issue, Coinbase had notified Arena that certain personal information associated with him had been exposed in a data-security incident affecting Coinbase users. Arena alleges that this circumstance placed Coinbase on notice of a heightened foreseeable risk that he could be targeted with account-specific phishing or social-engineering attacks.

541. Coinbase Wallet permits users to import or associate existing wallet credentials and seed phrases. As alleged above, zeroShadow determined that a wallet generated through a seed phrase on September 26, 2025 was imported into Arena's application on November 4, 2025 UTC, even though Arena believed the wallet displayed in the application was a wallet he had previously created and exclusively controlled.

542. zeroShadow found no screen sharing and no malware on Arena's mobile device and reported that the mechanism of the wallet import remained unclear.

543. On information and belief, Coinbase failed to design or implement reasonable safeguards capable of preventing or sufficiently warning Arena of an imported or associated wallet whose credentials were already known or controlled by an unauthorized third party.

544. Reasonable safeguards could have included meaningful user confirmation before wallet import or association, enhanced authentication tied specifically to wallet-import events, conspicuous notice of new or imported wallet credentials, and warnings concerning the security consequences of importing a seed phrase or wallet controlled elsewhere.

545. Arena reasonably relied on the Coinbase Wallet interface and Coinbase's representations concerning a secure, user-controlled wallet environment in using the displayed wallet as the destination for substantial cryptocurrency.

546. After Arena transferred his cryptocurrency to the wallet environment he believed he controlled, the assets were removed without his authorization and transferred to addresses controlled by Doe.

547. Arena did not authorize, approve, or ratify those removals.

548. Arena alleges that Coinbase's negligent design and failure to employ reasonable wallet-import, authentication, confirmation, and warning safeguards materially contributed to Doe's ability to position or exploit a wallet under Doe's control as the destination for Arena's assets.

549. As a direct and proximate result of Coinbase's negligence, Arena suffered substantial damages, including loss of cryptocurrency, loss of possession, use, and enjoyment of those assets, and consequential damages associated with investigation, tracing, and attempted recovery.

550. Arena is entitled to recover from Coinbase all damages available on this claim, subject to the existing arbitration stay and the determination of the claim in the appropriate arbitral forum.

## IX. COUNT IX – NEGLIGENT MISREPRESENTATION (ARENA v. PAYWARD, INC. d/b/a KRAKEN) – STAYED PENDING ARBITRATION

551. Plaintiff repeats and realleges each of the preceding paragraphs as though fully set forth herein. This Count is subject to the existing stay pending arbitration and is repleaded solely to preserve Arena's claim in this superseding Complaint.

552. Kraken publicly represented to customers, including Arena, that it provided "24/7 customer support," including support concerning account-security issues and suspected unauthorized access.

553. Those representations were specific and material statements concerning the availability and responsiveness of Kraken's customer-support services, particularly during time-sensitive security events involving assets held on Kraken's platform.

554. Kraken maintained a direct and ongoing commercial relationship with Arena and knew that customers holding substantial digital assets could reasonably rely on its representations concerning the availability of account-security support when determining how to respond to a suspected compromise.

555. At the time Kraken made the representations, Kraken knew or in the exercise of reasonable care should have known the actual availability, responsiveness, and limitations of its customer-support infrastructure.

556. During and immediately after Doe's fraudulent communications, Arena repeatedly attempted to contact Kraken to determine whether his account had actually been compromised and to obtain guidance concerning how to secure his assets.

557. Despite those attempts, Kraken failed to provide Arena with timely live assistance, confirmation, or guidance during the critical period and did not meaningfully contradict Doe's representations before Arena acted.

558. Arena reasonably relied on Kraken's representation that meaningful support would be available by attempting to obtain confirmation and guidance from Kraken rather than immediately disregarding the purported security warnings or taking a different protective course.

559. Because the promised support was not meaningfully available, Arena was forced to make urgent decisions concerning the safety of his cryptocurrency without confirmation from the platform holding those assets.

560. Arena alleges that had Kraken timely confirmed that his account was secure or that Doe's communications were fraudulent, Arena would not have transferred his cryptocurrency into the compromised wallet environment and the subsequent theft would not have occurred in the manner alleged.

561. Kraken's negligent misrepresentations concerning the availability of customer support therefore materially contributed to Arena's reliance on Doe's false security warnings and his decision to move the assets.

562. As a direct and proximate result, Arena suffered substantial damages, including the loss of cryptocurrency, loss of use and enjoyment of the assets, and consequential damages associated with investigation, tracing, and attempted recovery.

563. Arena is entitled to recover from Kraken all damages available on this claim, subject to the existing arbitration stay and the determination of the claim in the appropriate arbitral forum.

## PRAYER FOR RELIEF

564. WHEREFORE, Plaintiff Joseph Arena respectfully requests that the Court enter judgment in his favor and against Defendants, as applicable, and grant the following relief:

a. Award compensatory damages in an amount to be determined at trial, including the value of the cryptocurrency and traceable proceeds wrongfully converted, transferred, processed, monetized, or dissipated by Defendants;

b. Pursuant to G.L. c. 109A, avoid any fraudulent or voidable transfers to the extent necessary to satisfy Arena's claims and award all available relief against liable transferees, including attachment, injunction against further disposition, execution or levy, and a money judgment to the extent authorized by law;

c. Order restitution and disgorgement of any identifiable Arena-linked cryptocurrency, substitute assets, account credits, proceeds, fees, wagering revenue, spreads, or other benefits that Defendants are not entitled to retain;

d. Impose a constructive trust or other appropriate equitable remedy over any identifiable Arena-linked property, substitute assets, account credits, or traceable proceeds remaining in Defendants' possession, custody, or control;

e. Require preservation of all records concerning the Arena-linked transactions, including wallet, account, KYC, transaction, withdrawal, IP, device, compliance, and related records;

f. Require PackDraw, to the extent permitted by law, to produce identifying and transactional information concerning the account or accounts that received, controlled, wagered, transferred, or withdrew Arena-linked property;

g. Pursuant to 18 U.S.C. § 1964(c), award Arena threefold the damages proven to have been sustained by reason of Defendants' RICO violations, together with reasonable attorneys' fees and costs;

h. If personal jurisdiction is contested, permit targeted jurisdictional discovery concerning ChangeNOW's and PackDraw's United States and Massachusetts contacts, FixedFloat's Massachusetts contacts, and the specific transactions alleged herein;

i. Award pre-judgment and post-judgment interest as permitted by law;

j. Grant such other and further legal or equitable relief as the Court deems just and proper; and

k. With respect to Coinbase and Kraken, maintain the existing stays pending arbitration and preserve Arena's rights on the stayed claims without adjudicating those claims while arbitration proceeds.

**JURY DEMAND**

565. Plaintiff demands a trial by jury on all issues so triable.

JOSEPH ARENA

By his attorneys,

*/s/ Christina M. Murray*
Christina M. Murray
BBO #706426
Jonathan P. Whitcomb
BBO #704522
DISERIO MARTIN O'CONNOR
CASTIGLIONI LLP
c/o GESMER UPDEGROVE LLP
40 Broad Street
Boston, MA 02109
cmurray@dmoc.com
jwhitcomb@dmoc.com

T. Liam Murphy
N.Y. Bar #5857359
MURPHY'S LAW:
THE CRYPTO LAW FIRM
353 Lexington Avenue, 4th Floor, Suite 400
New York, NY 10016
liam@murphyslawcrypto.com

**CERTIFICATE OF SERVICE**

I, Christina Murray, do hereby certify I caused a true copy of the foregoing document to be served through the Court's Electronic Case Filing ("ECF") system upon all counsel of record in this action.

*/s/ Christina M. Murray*